*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 07a0141p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

KENNETH J. GRAHAM (05-2332); KYLE DRESBACH (05-2347),

*Defendants-Appellants.*

Nos. 05-2332/2347

>

---

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 03-80504—Arthur J. Tarnow, District Judge.

Argued: December 6, 2006

Decided and Filed: April 20, 2007

Before: BATCHELDER, GILMAN, and ROGERS, Circuit Judges.

---

### COUNSEL

**ARGUED:** Albert J. Krieger, Miami, Florida, Joan Ellerbusch Morgan, Sylvan Lake, Michigan, for Appellants. John Hinton, III, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Albert J. Krieger, Susan W. Van Dusen, Miami, Florida, Joan Ellerbusch Morgan, Sylvan Lake, Michigan, for Appellants. John Hinton, III, Alan Hechtkopf, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

ROGERS, J., delivered the opinion of the court, in which GILMAN, J., joined. BATCHELDER, J. (pp. 9-10), delivered a separate dissenting opinion.

---

### OPINION

---

ROGERS, Circuit Judge. The criminal defendants in this appeal contend that the failure of the Government's cooperating witness to produce fifteen boxes of evidence until late in the trial constituted a violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Defendants Kenneth Graham and Kyle Dresbach were convicted of conspiracy to commit mail fraud and to file false tax returns, conspiracy to commit money laundering, money laundering, and subscribing false tax returns. These charges were based on a kickback scheme in which the defendants caused Thyssen, Inc., a steel

1

processing company, to overpay for equipment while a portion of the amount fraudulently charged was funneled back to the defendants through shell entities created by their attorney, Jerome Allen. Allen was an unindicted co-conspirator who acted as a cooperating witness for the Government pursuant to a plea agreement.

Near the end of the defendants' trial, Allen produced fifteen boxes of documents, some of which pertained to his representation of Graham. Graham and Dresbach argue that the district court erred by failing to find that the Government violated its obligations under *Brady* by not causing these documents to be produced earlier. The Government responds that these documents were not material under *Brady* and that there was no violation of *Brady* because the evidence was in the exclusive control of a cooperating witness and not the Government. Dresbach also raises issues involving alleged ineffective assistance of counsel, improper failure to sever the two cases, and error in the giving of a supplemental jury instruction after the jury had indicated that it had reached a verdict.

Because the cooperating witness here was not acting on behalf of the Government, and the defendants' other contentions do not warrant reversal, the convictions of both defendants are affirmed.

## I. General Background

On May 20, 2003, a federal grand jury returned a ten-count indictment against Graham and Dresbach, charging both with conspiracy to commit mail fraud and to file false tax returns, conspiracy to commit money laundering, money laundering, and subscribing false tax returns. The Government filed a superseding indictment on September 18, 2003. The essence of the Government's case was that Graham and Dresbach conspired to defraud Thyssen, Inc., a steel processing company headquartered in Detroit, Michigan, of $6.5 million in a kickback scheme spanning from 1991 to 2001.

Graham was Thyssen's chief executive officer until 2001, and Dresbach was the company's executive vice president until he retired in 1996. The Government alleged that Graham and Dresbach used their positions at Thyssen to cause the company to purchase machinery at fraudulently inflated prices. The inflated prices included higher commissions for an equipment broker, who then funneled the excess commissions to Jerome Allen, an accountant and attorney who worked for Graham and Dresbach. Allen then distributed part of the money to Graham and Dresbach, primarily by writing checks to pay for personal expenses as directed by the defendants.

Graham and Dresbach were tried jointly before a jury in a trial that began on July 22, 2004. Allen was an unindicted co-conspirator in the case and testified against the defendants pursuant to a plea deal with the Government. On August 12, 2004, the jury convicted Graham and Dresbach on all counts charged in the superseding indictment. Both defendants filed motions for a new trial. The district court denied those motions on June 8, 2005. On August 30, 2005, the district court sentenced both defendants. These timely appeals followed.

## II. Graham's Appeal

Graham's appeal arises from Allen's production of fifteen boxes of financial and legal documents three weeks into the trial. Because Allen was not acting on behalf of the prosecution, this late production of evidence was not a *Brady* violation.

Graham asserts that, approximately one year prior to the start of trial, his attorneys demanded that Allen turn over all documents in Allen's possession pertaining to Graham. Graham alleges that he received a total of five boxes from Allen's counsel and was told that they contained all of the files

and records related to Graham that Allen possessed.  On March 15, 2004, the prosecutors and case agent again interviewed Allen as part of their final trial preparation.  The prosecutors' notes from that interview included the following comment: "Haven't turned over old files, 1980s, to Graham's attorney. We want to review them first."  Despite this note, nothing in the record indicates that the Government ever had possession of these files.

On June 29, 2004, the Government sent a letter to Graham's attorney, erroneously indicating that the notes pertaining to the Allen interview were enclosed.  Graham's attorney informed the Government of the missing enclosures during the final pretrial conference on July 19, 2004.  On that day, the Government provided Graham copies of the notes and the district court granted a two-day adjournment.

On July 22, 2004, prior to the commencement of opening statements, Graham moved to dismiss the indictment based on the fact that Allen possessed files that had not been turned over to Graham.  During oral argument on the motion, the Government explained the nature of the interview notes turned over to the defendants only a few days earlier and stated that the Government had already provided Graham with all the documents that it had received from Allen.  The court denied the motion.

On the evening of August 5, 2004, three weeks into trial, the Government notified Graham's attorney that Allen had produced copies of four previously undisclosed promissory notes from the early 1990s.  The next day, Graham moved for a mistrial based on the late disclosure of that evidence.  During the hearing on the motion, Allen's attorney reported that the new documents were found in a previously undiscovered box of Graham documents.  In response to a subsequent subpoena, Allen produced fifteen boxes of documents.

Defendants again moved for dismissal of the charges and, in the alternative, for a mistrial. When Allen was questioned about the fifteen boxes, he testified that he had actually found the boxes "a month, a month and a half ago" while cleaning out some storage lockers containing old client files.  At least some of these boxes were marked "Graham."  Allen thought that he had informed the Government of the existence of these boxes at that time, though he himself "hadn't looked at them" and did not know about the contents of the boxes until August 5, 2004, when the Government asked Allen's attorney to inquire as to whether Allen had any old tax returns going back to 1974.  The district court denied the motion for mistrial because there was no evidence of concealment by the Government; the court noted that the defendants could renew the motions if exculpatory material were found in the fifteen boxes.

The trial continued, and on November 15, 2004, three months after the jury had returned guilty verdicts on all counts, Graham renewed his motions for a mistrial, dismissal, and a new trial, attaching twenty-seven exhibits culled from the fifteen boxes.  The district court denied Graham's motion for a new trial under *Brady v. Maryland*, 373 U.S. 83 (1963), because it found that the Government had not suppressed the fifteen boxes in Allen's possession.  The district court also denied Graham's motion for a new trial under Rule 33(a).  Graham now challenges the district court's *Brady* determination.

Graham cannot show that the Government suppressed the evidence upon which he bases his appeal; therefore, he cannot establish a violation of due process under *Brady*.  Because Allen was not "acting on the government's behalf," the Government cannot be said to have suppressed the fifteen boxes of documents in Allen's control.  *See Kyles v. Whitley*, 514 U.S. 419, 437 (1995).

This court reviews denial of a motion for new trial based on *Brady* violations under an abuse of discretion standard.  *United States v. Jones*, 399 F.3d 640, 647 (6th Cir. 2005).  However, the

district court's determination as to the existence of a *Brady* violation is reviewed de novo. *United States v. Miller*, 161 F.3d 977, 987 (6th Cir. 1998).

To establish a *Brady* violation, Graham has the burden of showing that the Government suppressed evidence, that such evidence was favorable to the defense, and that the suppressed evidence was material. *Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000). "'*Brady* is concerned only with cases in which the government possesses information which the defendant does not.' Further, there is no *Brady* violation if the defendant knew or should have known the essential facts permitting him to take advantage of the information in question, or if the information was available to him from another source." *Id.* (quoting *United States v. Mullins*, 22 F.3d 1365, 1371 (1994)).

Graham's claim fails to satisfy the suppression prong of the *Brady* analysis, because he has not shown any withholding of evidence within the control of the Government. *Brady* and its progeny have recognized a duty on the part of the prosecutor to disclose material evidence that is favorable to the defendant over which the prosecution team has control. "But *Brady* clearly does not impose an affirmative duty upon the government to take action to discover information which it does not possess." *United States v. Beaver*, 524 F.2d 963, 966 (5th Cir. 1975). Graham never alleges that the Government actually possessed the fifteen boxes of evidence at issue here. Rather, it is undisputed that the evidence was in the personal control of Allen until he disclosed it to all parties late in the trial. Nonetheless, Graham argues that the Government exercised effective control over the evidence because Allen was a cooperating witness. Neither the case law nor the facts of this case support this argument.

*Kyles v. Whitley*, 514 U.S. 419 (1995), relied upon by Graham to argue that Allen was a de facto agent of the Government, does not require reversal based on Allen's failure to produce the undisclosed evidence. *Kyles* dealt with whether undisclosed evidence was sufficiently material to warrant reversal of a conviction. The state argued in part that some of the favorable evidence was in the hands of the police but was not disclosed to the prosecution until after trial. *Id.* at 438. In its analysis, the Supreme Court commented that *Brady* imposed upon the individual prosecutor "a duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including the police." *Id.* at 437. However, cooperating witnesses such as Allen stand in a very different position in relation to the prosecution than do police officers and other governmental agents. The Supreme Court in this regard relied directly on the fact that "the prosecutor has the means to discharge the government's *Brady* responsibility if he will." *Id.* at 438. That is not necessarily the case with regard to cooperating witnesses, as the circumstances of this case demonstrate.

Even if the scope of the prosecutor's liability in theory could extend to a cooperating witness if that witness were sufficiently identified with the prosecution team (a question that we do not reach in this case), the record here does not support Graham's contention that Allen was in effect a government agent. While cooperating with the Government pursuant to the terms of his plea agreement, Allen remained an independent actor. As evidence of this fact, the Government notes that it had to obtain approval from Allen's attorney before interviewing him and had to serve a subpoena on him to compel the production of documents. Another clear indication of Allen's independence from the Government is the fact that Allen refused to provide the Government with materials that were covered by the attorney-client privilege.

As evidence of the Government's control over Allen, Graham cites the note taken during a March 15, 2004, interview with Allen. In that interview, the Government learned that Allen may have possessed additional records relevant to Graham that had not been disclosed to any party. The anonymous note said in part, "Haven't turned over old files, 1980's, to Graham's attorney. We want to review them first." Although it is appears from this note that the Government was interested in any older files Allen might possess, it does not show, and Graham does not allege, that the

Government actually had possession of the fifteen boxes at issue here. It was not until Allen produced the fifteen boxes during trial that either party had any knowledge of their contents. Therefore, contrary to Graham's argument, this note falls short of demonstrating that the Government had control over Allen or any documents remaining in his possession.

Graham additionally argues that Allen acted as a "government agent-without-portfolio" during the Government's investigation of Graham. The only evidence Graham offers to support this argument is the fact that Allen continued to provide legal services and collect fees from Graham even after Allen had begun secretly cooperating with the Government. However, there is no evidence in the record that Allen did anything other than review the Government's evidence of the kickback scheme and agree to plead guilty and cooperate. Absent any evidence that the Government had sufficient control over Allen to transform him into an agent of the prosecution, Graham's argument that the Government suppressed documents within Allen's exclusive control fails.

Because the evidence upon which Graham bases his *Brady* claim was not suppressed by the Government, we need not reach the materiality prong of the *Brady* analysis.

We also do not reach the claim of prosecutorial misconduct that Graham's counsel raised for the first time at oral argument. The substance of that claim appears to be that because the Government knew of the possible existence of additional documentary evidence that Graham had not had an opportunity to review, it was a violation of due process for the Government in closing argument to refer to the absence of documentation supporting Graham's defense. Because prosecutorial misconduct was never raised or argued in his briefs to this court, Graham has abandoned this issue for purposes of this appeal. *United States v. Johnson*, 440 F.3d 832, 845-46 (6th Cir. 2006).

### III. Dresbach's Appeal

Dresbach raises three issues in addition to Graham's *Brady* argument that we rejected above. Dresbach argues that the district court erred in refusing to grant his motion for severance before trial. He also asserts that the district court abused its discretion by giving supplemental jury instructions after the jury notified the court that it had reached a verdict. Finally, he alleges a violation of his right to effective assistance of counsel. Each of these arguments fails.

### A.

Dresbach cannot show any error in the district court's denial of his motion to sever. Before his trial began, Dresbach filed three motions asking the district court to sever the defendants' trials. Dresbach's argument in favor of severance in each was essentially that most of the evidence at trial would pertain to Graham and not to Dresbach. The district court denied Dresbach's motions and tried the defendants jointly.

Dresbach does not dispute the fact that key testimony concerning the underlying kickback scheme, such as the testimony of Jerome Allen, pertained to both defendants. At trial, Graham presented a defense based on the existence of alternative sources of cash (a "cash hoard") and the existence of a prior loan to Allen, both of which allegedly accounted for the proceeds of the conspiracy. Much of the evidence at trial was directed at rebutting Graham's defenses, and therefore did not pertain to Dresbach. Dresbach also asserted that "he was never in any conspiracy," but argued in the alternative that, if the jury decided that he was in a conspiracy, he should nonetheless be acquitted because he would have withdrawn from the conspiracy upon his retirement from Thyssen in 1996, and therefore the statute of limitations had expired.

In this appeal, Dresbach maintains that the district court erred in not granting his motion because "the overwhelming evidence at trial pertained exclusively to Graham's case" and because

the defenses offered were mutually antagonistic. This court recently addressed Dresbach's first contention in *United States v. Gardiner*, 463 F.3d 445 (6th Cir. 2006). In *Gardiner*, defendant Lupo made exactly the same argument: "'[t]he overwhelming evidence at trial pertained to Gardiner's case and did not involve Mr. Lupo. The jury was left with no other to conclusion to reach but that, due to the strong case against Gardiner, Lupo must also be guilty.'" 463 F.3d at 473 (quoting defendant's brief). This court held that:

> Lupo's argument is expressly foreclosed by the *Warner* holding that severance is not required because the proof may be stronger against one defendant than another. Lupo's argument that more evidence was presented at trial against Gardiner is not enough to show specific, actual or compelling prejudice. Accordingly, Lupo's motion for severance was properly denied.

*Id.* (citing *United States v. Warner*, 971 F.2d 1189, 1196 (6th Cir. 1992)). *Gardiner*'s holding clearly applies to Dresbach's claim here. Furthermore, although the nature of the evidence offered in Graham's defense prompted the Government to present rebuttal evidence against Graham which did not pertain to Dresbach, the central evidence of the kickback scheme that gave rise to the charges against both defendants was the same.

Dresbach's contention that his and Graham's defenses were antagonistic is equally without merit. This court has held that "[t]he burden is on defendants to show that an antagonistic defense would present a conflict 'so prejudicial that defenses are irreconcilable, and the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty.'" *Warner*, 971 F.2d at 1196 (citations omitted). "[A] difference in trial strategies [does not] mandate separate trials." *Id.* While Dresbach and Graham pursued different strategies at trial—Dresbach relied primarily on a withdrawal defense and Graham presented evidence of alternative sources of income—there is simply no logical inconsistency between their defenses. Because Dresbach cannot show that there is any conflict between the defense theories, the district court properly denied his motion for severance.

**B.**

The district court did not abuse its discretion by giving a supplemental jury instruction concerning the statute of limitations on Counts 1 and 2. In its original instruction to the jury, the district court stated that, with regard to the alleged conspiracies, the jury had to find that a member of the conspiracy did at least one of the overt acts specified in the indictment. The district court also instructed the jury to list all the overt acts that it found beyond a reasonable doubt on a special verdict form. After the jury retired for deliberations, the Government brought to the district court its concern that, because of the limited space provided on the jury form and relying on the "at least one overt act" instruction, the jury might provide only a partial listing and leave off acts that would be relevant to Dresbach's withdrawal and statute of limitations defense. The Government proposed the following supplemental instruction:

> If the government fails to prove that an overt act occurred after May 20, 1998, then Mr. Graham and Mr. Dresbach cannot be convicted of the conspiracies charged in Counts 1 and 2, because the statute of limitations has run, and you must find them not guilty. Therefore, before you can return a verdict of guilty on Counts 1 and 2 for either Mr. Graham or Mr. Dresbach, you must unanimously agree that at least one overt act was committed after May 20, 1998.

Dresbach objected to the district court's giving any supplemental instruction because it would be unfair to change the instructions after the parties had made closing arguments. Dresbach's counsel also argued that since the jury had not asked for clarification and had already indicated that

it had reached a verdict, there should be no change in the instruction. The district court stated that it believed the supplemental instruction was to the benefit of both defendants, especially Dresbach. The district court held that the original instruction contained "an error of omission," and delivered the supplemental instruction.

Dresbach argues that the district court lacked authority to give the supplemental jury instruction absent a request for clarification from the jury and after an announcement by the jury that it had reached a verdict. Additionally, Dresbach asserts that the effect of the challenged instruction in this case was to overemphasize the need to find an overt act after May 20, 1998, effectively directing the jury to find an overt act that had occurred within the limitations period.

Dresbach relies on Federal Rule of Criminal Procedure 30 for his contention that the district court had no authority to give the supplemental instruction in this case. However, as other courts have recognized, "[b]y its terms and, as a matter of necessity, Rule 30 refers only to rulings on instructions requested by counsel '[a]t the close of the evidence or at such earlier time' as the court directs . . . . The rule simply does not prescribe the procedure for supplemental instructions after the jury has retired." *United States v. Andrade*, 135 F.3d 104, 110 (1st Cir. 1998) (quoting Fed. R. Crim. P. 30 and citing *United States v. Fontenot*, 14 F.3d 1364, 1368 (9th Cir. 1994)).

Furthermore, this court has recognized that it is sometimes necessary and proper for the trial court to re-charge a jury to correct possible misunderstandings based on the original instruction given. *See United States v. Oliver*, 766 F.2d 252, 254 (6th Cir. 1985). It is firmly established that a trial court's duty to give instructions "exists independently of questions from the jurors." *Kelly v. South Carolina*, 534 U.S. 246, 256 (2002).

That the jury had already informed the court that it had reached a verdict does not render the supplemental instruction improper. In other contexts, this court has held that until a jury verdict is announced and accepted, a verdict is not official and the jury remains under the authority of the trial court. *See United States v. Love*, 597 F.2d 81, 85 (6th Cir. 1979). Therefore, the mere fact that the jury had sent a note stating that it had concluded its deliberations did not relieve the trial court of its authority to instruct the jury on the law of the case.

Finally, Dresbach asserts, without explanation, that the supplemental instruction here overemphasized the statute of limitations issue and directed a verdict for the Government. Dresbach's objection to the emphasis that the instruction placed on the statute of limitations issue is difficult to comprehend in light of the assertions contained in his brief that the primary defense offered on his behalf at trial was that he had "withdrawn from the conspiracy and the statute of limitations had run," and that "[t]his was a critical issue at trial, one which both parties argued in closing arguments." In fact, Dresbach raised this issue in his motion to dismiss, in his opening statement, and in his summation.

Dresbach's related assertion that the effect of the supplemental instruction was to direct the jury to find overt acts that occurred in the limitations period is also without merit. The wording of the instruction clearly placed the burden for proving an overt act after May 20, 1998, on the Government, and instructed the jury that "you must unanimously agree that at least one overt act was committed after May 20, 1998." Further contradicting Dresbach's assertion that the supplemental instruction essentially directed a verdict is the district court's preface to the instruction asking the jury to listen carefully and "then retire to the jury room and see if it has any impact on your verdict or not." Both the text of the instruction and the court's preface make it clear that the determination of whether there was an overt act within the limitations period was entirely left to the jury. Accordingly, the district court did not abuse its discretion in choosing to give the supplemental jury instruction at issue here.

## C.

Because the record on direct appeal is inadequate to address Dresbach's claim of ineffective assistance of counsel, we do not reach it.

Dresbach argues that his trial counsel's performance was inadequate in several ways, including: failure to investigate public records which would have contradicted material elements of Allen's testimony, failure to object to the admission of a deposition that contradicted other statements the witness made to the Government and the related failure to introduce the previous exculpatory statements, failure to subpoena material information, multiple instances of unprofessional conduct, failure to present evidence of other sources of income and cash as an alternative to Dresbach's withdrawal and statute of limitations defense, and failure to be present for a conference in which the court discussed the admission of exhibits.

This court will not ordinarily consider ineffective assistance of counsel claims on direct appeal because the record usually is not sufficiently developed to permit proper assessment of such claims. *See United States v. Brown*, 332 F.3d 363, 368-69 (6th Cir. 2003). "This rule stems from the fact that a finding of prejudice is a prerequisite to a claim for ineffective assistance of counsel, and appellate courts are not equipped to resolve factual issues. As a result, our court has routinely concluded that such claims 'are best brought by a defendant in a post-conviction proceeding under 28 U.S.C. § 2255 so that the parties can develop an adequate record on this issue.'" *United States v. Aguwa*, 123 F.3d 418, 423 (1997) (citations omitted).

Multiple factual issues that are not developed in this record must be resolved to assess Dresbach's claim properly. For example, the record contains no evidence, beyond Dresbach's allegations, of the public records which Dresbach asserts should have been used in the impeachment of Allen. Similarly, at this time the court has no indication of what, if any, additional evidence existed concerning Dresbach's other sources of income which could have been offered at trial.

In light of the insufficiency of the evidence in the record before this court, Dresbach's claim should await consideration in a post-conviction proceeding under § 2255.

## IV.

For the foregoing reasons, the convictions of both defendants are affirmed.

---------------

**DISSENT**

---------------

ALICE M. BATCHELDER, Circuit Judge, dissenting. I write separately to express my view that the circumstances of this case constitute a violation of the defendants' right to due process. Because I would reverse the district court and order a new trial, I must respectfully dissent.

I believe the evidence contained in the suppressed files is of sufficient exculpatory and impeachment value to demonstrate materiality and warrant a new trial. The promissory notes support the defendants' theory and impeach the prosecution's key witness, Jerome Allen. Other financial statements, signed in blank to be filled in by Allen, support the defendants' theory that they had trusted Allen and often signed legal documents without reading them, which the prosecution had decried as unbelievable and unsupported by any evidence. Original records from Commerzbank document deposits of almost $600,000 to an account in Graham's name, earning annual interest of 12 to 18%, which directly contradicts prosecution testimony that no such account existed. The transactions, withdrawals, and deposits of extremely large amounts of cash support the defense theory, which the prosecution had repeatedly characterized to the jury as "fantastic."

Under our Constitution and our system of justice, the prosecution is obligated to disclose to the defense all impeaching or exculpatory evidence in its possession. *Brady v. Maryland*, 373 U.S. 83 (1963). The prosecution also has a duty to learn of "favorable evidence known to others acting on the government's behalf." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). The defense need not request this information from the prosecution and inadvertence is no excuse. *Strickler v. Greene*, 527 U.S. 263, 280-82 (1990). Therefore, the defense is entitled to rely on the prosecution's representations regarding its compliance with its *Brady* obligations. *Banks v. Dietke*, 540 U.S. 668 (2004). The rule is not designed to punish the prosecution for misconduct, but to ensure that defendants receive fair trials. *See United States v. Beasley*, 576 F.2d 626, 630 (5th Cir. 1978) ("*Brady* is not a discovery rule, but a rule of fairness and minimum prosecutorial obligation.").

In the present case, the district court framed the question as whether it is "negligence for the Government to be stonewalled by their snitch," and held that "[i]f there was suppression in this case, it was Allen's doing, not that of the government, and *Brady* does not extend to his activity." I believe this mischaracterizes the question. The government was not "stonewalled" in this case -- as is evident from both the government's conduct and Allen's testimony. On the contrary, the government was fully aware, as of March 15, 2004, at the latest, that Allen had more of Graham's files and the government acted on that knowledge during trial by instructing Allen to return home and search those files for evidence that it could use to impeach Graham's testimony.

Ultimately, the district court reasoned that the prosecution's duty-to-discover under *Kyles* is only applicable to police officers and government agents, and does not extend to cooperating witnesses such as Allen, i.e., "snitches." I disagree with this reading of *Kyles*, which states: "the individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including the police." *Kyles*, 514 U.S. at 437. In my view, this language is inclusive, not exclusive, and at least implies that the duty begins rather than ends with the police. The limitation to police is particularly suspicious in this case where Allen, while continuing to represent the defendants as lawyer, fiduciary, and tax advisor (even preparing Graham's 2002 tax returns), was covertly providing information to the government in accordance with his plea and cooperation agreement, and was providing documents to the government prosecutor, while those exculpatory files -- which were actually Graham's property -- sat, unbeknownst to Graham, in Allen's garage. Although it is unclear if or why Allen failed to disclose

the extra files to the government before March 15, 2004, there can be no dispute that he did so at that time, and the government's alleged "disclosure" to the defendants is dubious at best.

The government criticizes the defense for failing to subpoena Allen, but Allen -- via his personal attorney -- had told Graham and Dresbach that he had already provided *all* the files in his possession and the rest had been destroyed. Furthermore, a client need not obtain a subpoena to retrieve his own files from his own attorney. The government also criticizes the defense for failing to move for an order, but that is not required under *Strickler*, and the government had already exclaimed that Allen had no more of Graham's files and that it had provided the defense with all there was to provide. The government contends that the defense had just as much access to the files as it did, but it was the government that led the defense to believe that there were no more files, it was the government that had control over Allen via the cooperation agreement and the ability to penalize Allen for withholding information from them, and it was the government that ordered Allen to retrieve the files from his garage, knowing that Allen had more files, even after asserting to the defense that he did not. Finally, the government contends, as the district court suggested, that this was a failure of "defense preparation rather than prosecutorial misconduct." But, even if that were true, *Brady* is not a rule to deter prosecutorial misconduct, and innocence is not an excuse.

The prosecution should not be allowed to cherry-pick the incriminating evidence out of a cooperating witness's files and leave the rest, only to hide behind the assertion, when challenged, that it never had actual possession of those (exculpatory) files and therefore had no obligation to provide them to the defense. Whether or not the prosecution intentionally engaged in such conduct in this case, it is clear that the prosecution provided some (hand-picked) files while allowing the defense to believe mistakenly that it had received from the prosecution all the files that were available. Even if the government was innocent and equally misled by Allen, as it now seems to argue, that is no answer. *Brady* is intended to ensure that the defendant gets the same evidence that is available to the prosecution. That is why the government must pursue it and provide it, even if the defendant does not specifically ask for it. By failing to construe the rule as a guarantee of fairness, the district court improperly limited *Brady*, *Strickler*, and *Kyles*.

I respectfully dissent.