**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 11a0200n.06

**Nos. 08-3994/09-4124**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
**Apr 01, 2011**
LEONARD GREEN, Clerk

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff-Appellee, | ) ON APPEAL FROM THE |
| | ) UNITED STATES DISTRICT |
| v. | ) COURT FOR THE |
| | ) SOUTHERN DISTRICT OF |
| JAMES E. DIERKER, | ) OHIO |
| | ) |
| Defendant-Appellant. | ) **OPINION** |
| | ) |

BEFORE:  GIBBONS and WHITE, Circuit Judges, and MALONEY,[*] District Judge.

**HELENE N. WHITE, Circuit Judge.**   Defendant James E. Dierker was convicted of one count of conspiracy to commit securities and wire fraud, 18 U.S.C. § 371, one count of conspiracy to commit money laundering, 18 U.S.C. § 1956, and two counts of concealment money laundering, 18 U.S.C. § 1956(a)(1)(B)(i).  He was sentenced to serve concurrent terms of sixty months for each conviction, and ordered to pay $7,885,000.00 in restitution and forfeit $47,572,373.63.   Dierker appeals his conviction and sentence, as well as the district court's restitution and forfeiture orders. We affirm in part and reverse in part.

---

[*]The Honorable Paul L. Maloney, Chief Judge of the United States District Court for the Western District of Michigan, sitting by designation.

**I.**

The facts surrounding this case are described in detail in *United States v. Faulkenberry*, 614 F.3d 573 (6th Cir. 2010), an appeal by one of Dierker's co-defendants. We include them here only as necessary to review Dierker's arguments.

National Century Financial Enterprises (NCFE) purchased healthcare providers' accounts receivable at a discount and pooled those receivables to secure bonds that it sold to institutional investors to raise capital for the purchase of the receivables. NCFE also collected program fees from the healthcare providers. The investors earned interest and were repaid through collections on the receivables. Providers, meanwhile, were paid almost immediately for services, rather than having to wait for insurers to process and pay claims. This business model was, in theory, a sound one.

NCFE operated primarily through two subsidiaries, NPF VI and NPF XII. These entities issued the actual bonds. Another NCFE subsidiary, National Premier Financial Services (NPFS), was responsible for performing the day-to-day services necessary to purchase the receivables, administer the accounts, and manage the collection of the receivables. A Master Indenture Agreement detailed the legal obligations among the bond issuers, NPFS, and the banks that served as trustees of the NPF programs' accounts. NPFS was responsible for determining which receivables were eligible for purchase and the trustee banks were required to monitor the programs on behalf of the bondholders. The notes issued to bond-holders contained written terms that restricted the use of the funds invested to the purchase of eligible receivables. The notes also detailed credit enhancements, including overcollateralization, credit reserves, and other means of ensuring that the principal owed on the notes would be secure.

Although its business model was outwardly strong, the actual practices of NCFE varied drastically from what investors were promised. Rather than being used only to fund the purchase of eligible receivables, much of the funding brought in from the sale of bonds was used to advance money to healthcare providers without the purchase of receivables. Several of these providers had no realistic ability to repay the advances and lacked adequate receivables to support the amounts advanced. The improper advances, some of which were made to companies in which NCFE principals held ownership stakes, severely depleted the cash reserves that NPF VI and NPF XII were required to maintain to protect bondholders. To cover the losses, NCFE issued more notes. NCFE executives also falsified data presented to investors. Additionally, NCFE moved funds between various accounts within and across NPF VI and NPF XII to meet minimum funding requirements on reporting dates. The reporting dates for the two programs were staggered so that the same funds could be counted separately by each program to meet investor requirements.

Eventually, the scheme became unsustainable. At the end of September 2002, one of the trustee banks blocked a transfer between NPF VI and NPF XII, triggering an event of default. In November 2002, NCFE filed for bankruptcy, resulting in investor losses of approximately $2.4 billion. On November 12, 2002, the FBI raided NCFE's headquarters, seizing its files and documents. The ensuing investigation revealed substantial financial irregularities.

In 2006, the government secured indictments against seven of NCFE's executives on charges of conspiracy, securities fraud, wire fraud, mail fraud, and money laundering.[1] Dierker was charged

---

[1]Three other former executives cooperated with the government and pled guilty.

based on his authorization of advances to California Psychiatric Management Services (CPMS), a

healthcare company in which NCFE held a 49.9% ownership interest, and which received funds from

NPF XII. In June 2000, CPMS filed a Chapter 11 bankruptcy petition. NPF X, an NCFE entity

responsible for non-investor funds, was appointed as CPMS's post-petition financing party. Millions

of dollars' worth of credit was extended to CPMS from NPF XII, instead of NPF X. Dierker was

in charge of the CPMS account during the relevant time period.

Five of the seven executives, including Dierker, were jointly tried. After a six-week trial and

two days of deliberation, Dierker was convicted of one count of conspiracy to commit securities and

wire fraud, one count of conspiracy to commit money laundering, and two counts of concealment

money laundering. Dierker moved for a judgment of acquittal pursuant to Federal Rule of Criminal

Procedure 29 at the close of the government's case-in-chief and again at the close of trial. The

district court denied both motions, as well as Dierker's renewed motion made following his

convictions, stating:

> The trial in this case lasted for six weeks. The twenty-two volume trial transcript
> shows that Defendants had considerable opportunities to, and in fact did, attack the
> Government's evidence against them by putting on their own defenses and by
> extensively cross-examining the Government's witnesses and challenging its
> documentary evidence. The record also shows that the evidence against Defendants
> was substantial. Six former National Century employees testified and three of
> these—Jon Beacham, Sherry Gibson, and Jessica Bily—were senior executives with
> intimate knowledge of the company's operations and how it perpetrated investor
> fraud. Each of these executives admitted to engaging in criminal conduct and they
> all implicated Defendants in the criminal conspiracy. Besides National Century
> insiders, the Government put on witness testimony from the investors whose money,
> unbeknownst to them, was improperly used to make unsecured loans to healthcare
> providers. The Government also called to the stand representatives of the healthcare
> providers, who confirmed that they asked for, and received, hundreds of millions of
> dollars in National Century loans that the providers had little ability to pay back.

Dierker appeals, claiming that the evidence was insufficient to support his convictions, that the government's failure to disclose potentially exculpatory evidence warrants a new trial, and that the district court erred in calculating restitution and forfeiture.

## II.

Dierker claims that the district court erred when it denied his motion for acquittal based on insufficiency of the evidence. He argues that the government failed to introduce sufficient evidence of his guilt and that his convictions stem from the jury's imputing evidence introduced against his alleged co-conspirators to him.

We review de novo a district court's denial of a motion for acquittal based on sufficiency of the evidence. *United States v. Mabry*, 518 F.3d 442, 447-48 (6th Cir. 2008). "In reviewing challenges regarding the sufficiency of the evidence presented to the jury, we are limited to ascertaining whether . . . *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Carmichael*, 232 F.3d 510, 519 (6th Cir. 2000) (internal quotations and citations omitted). We "must view all evidence and resolve all reasonable inferences in favor of the government." *United States v. Hughes*, 505 F.3d 578, 592 (6th Cir. 2007) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). In doing so, however, we do not independently weigh the evidence or substitute our judgment for that of the jury. *Id*. Thus, "[a] defendant bringing such a challenge bears a 'very heavy burden.'" *United States v. Daniel*, 329 F.3d 480, 485 (6th Cir. 2003) (citations omitted).

**A.**

We first address Dierker's conviction of conspiracy to commit securities and wire fraud in violation of 18 U.S.C. § 371. The government must show three elements to prove a conspiracy: "(1) the existence of an agreement to violate the law; (2) knowledge and intent to join the conspiracy; and (3) an overt act constituting actual participation in the conspiracy." *Hughes*, 505 F.3d at 593. "A tacit or material understanding among the parties to a conspiracy is sufficient to establish the agreement[, and a] conspiracy may be inferred from circumstantial evidence which may reasonably be interpreted as participation in a common plan." *Id.* (citations omitted) (alterations in original); *see also United States v. Conatser*, 514 F.3d 508, 518 (6th Cir. 2008) ("No proof of a formal agreement is required to establish a conspiracy to violate federal law; a tacit or mutual understanding among the parties will suffice. . . . Just as the conspiracy may be inferred from circumstantial evidence, a defendant's knowledge of and participation in a conspiracy also may be inferred from his conduct and established by circumstantial evidence.") (citations and internal quotations omitted).

Dierker contends that none of the government witnesses directly linked him to a conspiracy and that there was no evidence to support a finding that he knew of a conspiracy at NCFE. It is undisputed that NPF X was authorized to make advances to CPMS. It is also undisputed that advances were wrongfully made by NPF XII. Dierker claims that there is no evidence that he authorized, or was even aware of, the disbursement of funds from NPF XII. He claims that all his actions were consistent with the directives and orders of the United States Bankruptcy Court. Ample evidence and testimony indicated, however, that Dierker did knowingly join in the conspiracy to defraud investors. Although Dierker's observation that no document expressly establishes that he

authorized disbursements from NPF XII is accurate, there is sufficient circumstantial evidence that he was aware of the source of the funds and aided in facilitating the unsecured advances.

Dierker, who had joined NCFE in early 1999 and held the positions of associate director of marketing, vice president for client development, and chief credit officer over the course of his employment, was in charge of the CPMS account during the relevant time period. In June 2000, CPMS filed a Chapter 11 bankruptcy petition. Bryan Weiss, a member of CPMS's post-petition management committee, sent Dierker weekly e-mail requests for funding to pay operating expenses for two hospitals owned by CPMS. These requests included itemized summaries showing that the hospitals required hundreds of thousands of dollars in "supplemental funding"—funding that was "not supported by accounts receivable." Dierker forwarded Weiss's requests to NCFE's funding department with instructions to advance the requested amounts.

Dierker's e-mail correspondence reflected his knowledge that the majority of the funds provided to CPMS did not come from NPF X, as the bankruptcy court's order required. On June 7, 2001, Dierker forwarded an e-mail from Weiss to the NCFE funding department instructing that it fund "$530 thousand to CPMS rather than the $620 thousand [he had previously requested]. The $84 thousand difference [intended for DVI][2] will be funded via another affiliate." Jessica Bily, an NCFE executive and the manager of the funding department, testified that the term "another affiliate" referred to NPF X. Four days later, on June 11, 2001, Dierker requested that $84,024.12 be wired from NPF X to CPMS's account. Thus, if NPF X was the alternative "another affiliate"

---

[2]DVI was a CPMS creditor to which CPMS made monthly mortgage payments of approximately $84,000.

source of the $84,000, it could not be the source of the $530,000. Further, Dierker's response to an

e-mail from an accounting-department employee asking how the funds would be repaid to NPF X

indicates an awareness that funds had been transferred from NPF XII: "[i]n total there were 5 such

payments of [sic] $84,012.12, although the first one may have been the only one to have originated

from NPF X." It is also significant that the wire transfer request went directly to the accounting

department, rather than to the funding department. According to Bily, NCFE's accounting

department was responsible for funding NPF X, while the funding department administered NPF VI

and NPF XII. On July 12, 2001, Dierker sent an e-mail asking the funding department to "fund

$330[,000] to CPMS this week. However, please check with John Snoble[3] regarding the $84[,000]

for DVI. He may want to send that component from NPF X leaving $246[,000] to come from

funding." Bily testified that "from funding" referred to funds coming from NPF XII. Between June

29, 2001, and October 26, 2001, Dierker authorized numerous similar advances of funds to CPMS,

including an advance of $670,000 on August 3, 2001 and an advance of $720,000 on September 28,

2001.

Further, a September 26, 2001 memorandum recommending the sale of one of CPMS's

hospitals that Dierker sent to NCFE executives included a summary reflecting that reserves had been

deducted from CPMS's weekly funding during the bankruptcy. Sherry Gibson, an NCFE executive,

testified that NPF X did not maintain reserve accounts. Dierker also testified that "reserve accounts

were in the [accounts-receivable]-based funding programs" and that NPF X did not have reserve

---

[3]Snoble was in charge of NCFE's accounting department.

accounts. When asked about the September 26 memorandum, Dierker stated that although NPF X did not "require reserve accounts," it could withhold reserves "at our discretion depending on the transaction."

Additionally, Bily testified that she had concerns about CPMS funding and discussed them with Dierker. Specifically, Bily was worried that the "continual advancing of funds . . . from [NPF] VI and XII without any collateral" meant that NCFE "did not have enough money in the books to meet [the] compliance requirements of the investors." NCFE executive Jon Beacham also stated that Dierker told him in the summer of 2001 that "some of the clients that he was working with in client development were over-advanced"; these clients were "under water . . . and they were within the securitized programs." Bily testified that "[NPF] X was not a health care securitization program."

Gibson also stated that after an investor presentation, Dierker commented to her that the "Ivy League" investors "weren't asking questions . . . . about the funding program as it actually worked." Gibson testified that neither she nor Dierker ever told the investors "how the business actually worked." Finally, Dierker had been copied on certain significant and revealing memos, including one describing NCFE's "special funding arrangements" with certain healthcare providers.[4]

Dierker does not dispute that a conspiracy to commit fraud occurred at NCFE, but he argues that he was not involved in the conspiracy. However, this court will not weigh witness credibility, and a rational jury could have believed the testimony of Weiss, Beacham, Bily, and Gibson regarding

---

[4] One memo states that one provider, Comprehensive Addiction Programs, Inc., was "underfunded by approximately 7 mm." and explained that another provider, Tender Loving Care, "receives advances to meet budgetary needs. Apply reserve overages."

Dierker's knowledge. Dierker does not contest that he was involved in carrying out the transactions in question. Dierker's challenges address the inferences drawn from the evidence, rather than the insufficiency of the evidence. The inferences necessary to support the jury's guilty verdict were well within the realm of reason and common sense. We therefore find no error in the district court's denial of Dierker's motion for acquittal.

**B.**

Dierker next challenges his convictions of conspiracy to commit money laundering in violation of 18 U.S.C. § 1956, and concealment money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i). The concealment money-laundering conviction was based on wire transfers of $670,000 and $720,000 from NPF XII to CPMS.

Section 1956(a)(1)(B)(i) makes it a crime to engage in a financial transaction involving proceeds from specified unlawful activity "knowing that the transaction is designed . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds."

The Supreme Court recently interpreted the money-laundering statute, holding that the word "designed" requires proof of a purpose. *See Cuellar v. United States*, 553 U.S. 550, 563-64 (2008) ("[W]hen an act is 'designed to' do something, the most natural reading is that it has that something as its purpose."). In *Cuellar*, the Court heard an appeal of a conviction under § 1956(a)(2)(B)(i), which contains almost identical language to § 1956(a)(1)(B)(i), except that it relates specifically to transporting funds internationally. The defendant was caught attempting to drive to Mexico with $81,000 in proceeds from unlawful activity (drug trafficking), which he had hidden in a secret compartment under his car's rear floorboards. *See id.* at 553-54. The Court held that it was

insufficient to show that the funds had been disguised while being transported; rather, it was necessary to show that the transportation was aimed at disguising a listed attribute[5] of the funds. *See id.* at 563-64. The Court noted that concealing a listed attribute "need be only one of the purposes of the transportation," but that the government had only introduced evidence that hiding money was a means of facilitating its movement to Mexico. *Id.* at 567 n.7. No evidence established that the purpose of taking the money to Mexico was to disguise a listed attribute. The Court stated that

> the structural meaning of "design" is both overinclusive and underinclusive: It would capture individuals who structured transportation in a secretive way but lacked any criminal intent (such as a person who hid illicit funds *en route* to turn them over to law enforcement); yet it would exclude individuals who fully intended to move the funds in order to impede detection by law enforcement but failed to hide them during the transportation.

*Id.* at 565.

Dierker argues that the transactions at issue were not "designed to conceal," as the statute requires. Although Dierker did not advance this argument in his briefs, he raised it in a supplemental filing relying on this court's decisions in *United States v. Ayers*, 386 F. App'x 558 (6th Cir. 2010), and *Faulkenberry*, 614 F.3d 573. We have discretion to apply *Ayers* and the published precedent in *Faulkenberry* to a case that arose from the same underlying fraud.

In *Ayers* and *Faulkenberry*, we applied *Cuellar* and overturned the money-laundering convictions of Donald Ayers and Roger Faulkenberry, two NCFE principals. The convictions were based on wire transfers authorized by Ayers and Faulkenberry, which were accompanied by falsified

---

[5]"Listed attribute" refers to the nature, the location, the source, the ownership, or the control of the proceeds. *Cuellar*, 553 U.S. at 559.

receivables purchase reports and promissory notes stating that NCFE's own money, rather than investor monies, would fund the transaction. We held that the government failed to prove that these transfers were "designed in whole or in part . . . to conceal or disguise" the nature or source of the fraudulently obtained funds, *Faulkenberry*, 614 F.3d at 585, because the government did not show that "concealment was one of the purposes that drove [Ayers and Faulkenberry] to engage in the transaction[s] in the first place," *id.* at 586.

The government makes no attempt to distinguish these cases. Indeed, the government stated in its briefs and at oral argument that if this court "applies its holding in *Faulkenberry* to this case, Dierker's [money-laundering] convictions . . . should be reversed." We therefore reverse Dierker's money-laundering convictions.

**III.**

Dierker also asserts that the government wrongfully withheld evidence from a parallel Securities and Exchange Commission (SEC) investigation of the banks that served as trustees for NPF VI and NPF XII. In his second post-conviction motion for a new trial, Dierker argued that the government withheld depositions given by three individuals—Robert Panda and Cynthia Stephenson-Collins of Pricewaterhouse Coopers LLP, one of NCFE's outside auditors, and John Rothrock of Bank One, the trustee bank for NPF XII—as part of the SEC investigation, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).[6]

---

[6]Dierker points out that although the district court denied his *Brady* motion, it granted a nearly identical motion filed by his co-defendant, James K. Happ. This comparison does not help advance Dierker's arguments, however, as Happ was a severed co-defendant who was tried nearly a year after Dierker. Happ filed his motion for production of documents before his criminal trial and

We review the "denial of a motion for new trial based on *Brady* violations under an abuse of discretion standard. However, the district court's determination as to the existence of a *Brady* violation is reviewed de novo." *United States v. Graham*, 484 F.3d 413, 416-17 (6th Cir. 2007) (citations omitted).

As the district court correctly summarized:

> To establish a *Brady* violation, a defendant has the burden of showing that "the Government suppressed evidence, that such evidence was favorable to the defense, and that the suppressed evidence was material." *United States v. Graham*, 484 F.3d 413, 417 (6th Cir. 2007). "Material" means "that there is a reasonable probability that, had the evidence been disclosed to the defense, the outcome would have been different." *United States v. Jones*, 399 F.3d 640, 648 (6th Cir. 2005) (internal quotation marks and citation omitted). "Reasonable probability means a probability sufficient to undermine confidence in the outcome." *Id.* (internal quotation marks and citation omitted). "[T]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Strickler v. Greene*, 527 U.S. 263, 289-90 (1999). Indeed, "there is no *Brady* violation if the defendant knew or should have known the essential facts permitting him to take advantage of the information in question, or if the information was available to him from another source." *Graham*, 484 F.3d at 417 (internal quotation marks and citation omitted).

At the outset, it is not clear that Dierker satisfies the first requirement of a *Brady* claim, the suppression of evidence. The SEC depositions Dierker sought "were not only made available, but actually provided, to Defendants prior to trial. These depositions and their accompanying exhibits were clearly identified in a discovery index dated April 19, 2007, as 'SEC DEPOSITIONS AND EXHIBITS'. . . , requested by counsel for Defendant Ayers on April 23, 2007 to be made available

_____

this motion, unlike Dierker's *Brady* motion, was not a post-trial motion.

for copying . . . , and provided to Defendants pursuant to that request, beginning in April and at least

by August, 2007."[7]

Dierker has also failed to establish that the allegedly suppressed evidence was material. As

the district court found:

> Even assuming that the documents were not produced, there are no grounds under either *Brady* or Rule 33 for setting aside the verdict and granting Dierker a new trial. As this Court previously held, although the "evidence would have been 'favorable' to Defendants, [] the Court cannot say it was 'material,' such that its non-disclosure undermines confidence in the jury's guilty verdict[]. (Doc. No. 758, 67.) The Court is unconvinced that evidence that two PwC employees may have been aware of the "advancing" and may have believed it was appropriate and that an employee of the NPF XII Trustee believed that fluctuations in the reserve accounts were permissible would have tipped the scales in Dierker's favor enough to raise concerns about the fairness of the trial. This is particularly true given that any such testimony at trial could have been impeached by the presentation of evidence that the PwC auditors and the Trustees were later found by the SEC to be acting negligently with respect to their roles in connection with National Century. As the Court previously explained, "responsibility third parties may bear for failing to detect the fraud or furthering its ends, does not diminish Dierker's culpability as a National Century co-conspirator."

In light of this analysis, the district court did not abuse its discretion in determining that, even if there

was evidence of trustee negligence suppressed by the government, the evidence would not have

undermined confidence in the verdict and thus a new trial was not warranted.

---

[7]All defendants, including Dierker and Ayers, participated in the same Joint Defense Agreement, and therefore were expected to share information produced in discovery. Additionally, Ayers was designated as the individual who would coordinate discovery for defendants.

**IV.**

Finally, Dierker asserts that the district court erred in ordering him to forfeit $47,572,373.63 and to pay restitution in the amount of $7,885,000.00. Dierker objected to these determinations prior to and at sentencing.[8]

We review a district court's findings of fact at sentencing as to "loss" and restitution for "clear error," and its methodology for calculating loss de novo. *United States v. Rothwell*, 387 F.3d 579, 582 (6th Cir. 2004); *see also United States v. McCarty*, 628 F.3d 284, 290 (6th Cir. 2010). "A factual finding is clearly erroneous where, although there is evidence to support that finding, 'the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *United States v. Ware*, 282 F.3d 902, 907 (6th Cir. 2002) (citations omitted). However, "whether those facts as determined by the district court warrant the application of a particular guideline provision is purely a legal question and is reviewed *de novo* by this court." *United States v. Garner*, 940 F.2d 172, 174 (6th Cir. 1991).

Under the U.S. Sentencing Guidelines, the district court is to determine the amount of loss by a preponderance of the evidence. *McCarty*, 628 F.3d at 290. Particularly "in situations where the losses occasioned by financial frauds are not easy to quantify, the district court need only make a reasonable estimate of the loss, given the available information." *United States v. Triana*, 468 F.3d

---

[8]Significantly, Dierker does not argue that his sentence, which factored in a 30-level increase for actual loss, is procedurally or substantively unreasonable because Dierker also received a "19-level downward variance" based upon his "exemplary life history and characteristics and limited role in the offense." Instead, Dierker limits his argument here to "the financial impact of the erroneous rulings made by the district court at the time of Dierker's sentencing."

308, 320 (6th Cir. 2006) (citations omitted). "We review de novo the question of whether restitution is permitted under the law, and review the amount of a restitution award for abuse of discretion." *United States v. Boring*, 557 F.3d 707, 713 (6th Cir. 2009).

## A.

Forfeiture is not controlled by the Guidelines. *See United States v. Hall*, 411 F.3d 651, 654 (6th Cir. 2005). Instead, "[f]orfeiture is to be imposed upon a criminal defendant as provided by statute." U.S.S.G. § 5E1.4. Under 18 U.S.C. § 981(a)(1)(C), the following is subject to forfeiture:

> Any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of section 215, 471, 472, 473, 474, 476, 477, 478, 479, 480, 481, 485, 486, 487, 488, 501, 502, 510, 542, 545, 656, 657, 842, 844, 1005, 1006, 1007, 1014, 1028, 1029, 1030, 1032, or 1344 of this title or any offense constituting "specified unlawful activity" (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense.

In reaching the forfeiture-amount determination, the district court relied on GX VI-13, a report prepared by NCFE's funding department that summarized NCFE's funding of CPMS and other providers as of July 31, 2002. This report stated that the CPMS funding was undercollateralized by $47,572,373.63. The government had moved for an order of forfeiture against all defendants (including Dierker) in the amount of $1,771,918,476.29, but the district court concluded that only four of the defendants, and not Dierker, would be held jointly and severally liable for this amount. The district court found that "$47,572,373.63 fairly constitutes or is derived from proceeds traceable to Mr. Dierker's offenses. This amount is the total sum that NCFE's own documents showed that Mr. Dierker would be responsible for based on his advances."

There is no question that forfeiture is authorized by statute in this case. Moreover, sufficient evidence shows that Dierker was in charge of the CPMS account and that he was a knowing participant in the fraud perpetrated by NCFE. Given that the district court declined to hold Dierker jointly and severally liable for a much larger sum and limited Dierker's responsibility to his actions with respect to CPMS, we find no error.

**B.**

Restitution in this case was mandated by 18 U.S.C. §§ 3663 and 3663A, "which stipulate that restitution is required for victims of offenses under Title 18 of the United States Code." *United States v. Blanchard*, 618 F.3d 562, 576 (6th Cir. 2010). Under these statutes, "'if someone is convicted of a conspiracy, the court can order restitution for damage resulting from any conduct that was part of the conspiracy and not just from specific conduct that met the overt act requirement of the conspiracy conviction.'" *United States v. Elson*, 577 F.3d 713, 723 (6th Cir. 2009) (citations omitted). Courts must, however, "exclude injuries caused by offenses that are not part of the [conspiracy] of which [the defendant] has been convicted." *Id.* (quoting *United States v. George*, 403 F.3d 470, 474 (7th Cir. 2005)) (alterations in original).

The district court calculated Dierker's restitution amount based on the advances that he improperly made to CPMS. It found that "the monetary losses stemming from the NCFE fraud total $2,894,150,500. When [sic] taken into account recoveries to date, the total outstanding losses are $2,384,147,105.09." The district court held the other defendants jointly and severally liable for this amount, but reduced Dierker's restitution to "the amount of $7.885 million[,] which represents costs associated with his 19 illegal advances." In doing so, the district court reasoned that Dierker's role

in the fraud was much more limited than those of the other defendants.  Given that the district court ordered restitution commensurate with Dierker's role in the fraud, and did not exercise its discretion to hold Dierker jointly and severally liable for the total outstanding losses stemming from the fraud, the district court did not abuse its discretion in ordering the restitution amount.

**V.**

Based on the foregoing, we **AFFIRM** Dierker's conviction for conspiracy to commit securities and wire fraud, **REVERSE** Dierker's money-laundering convictions, and remand the case for resentencing.