OPINION
SLOVITER, Circuit Judge.
Appellants Mark Cocchiola and Steven Venechanos challenge procedural aspects of their criminal trial in which they were convicted by a jury of conspiring to commit and committing multiple financial crimes. Cocchiola also challenges the sentence he received from the District Court. We will affirm.[1]
I.
Cocchiola and Venechanos (“defendants”) were key players in Suprema Specialties, Inc. (“Suprema”), a company that manufactured and processed cheese for sale to supermarkets, other retail establishments, and food service industry distributors. Suprema was a New York corporation with headquarters in Paterson, New Jersey, and with wholly-owned subsidiaries in several locations throughout the United States.
The superseding indictment details an intricate scheme in which defendants, along with others, inflated Suprema’s sales and misrepresented its inventory through, among other things, fraudulent accounting practices and mislabeled products. As a result, Suprema was able to borrow large sums of money from Fleet Bank (now Bank of America) and the other banks that participated in its “revolving loan agreements.” Venechanos App. at 57.
In addition, defendants made false representations to the Securities and Exchange Commission (“SEC”) in the annual and quarterly reports that Suprema filed. These misrepresentations were also passed on to investors and other members of the public through press releases. Lastly, in connection with a November 2001 Suprema stock offering, defendants made false representations to the SEC, some of which were disseminated to potential investors.
Approximately three months after this stock offering, Suprema filed a voluntary petition for reorganization under Chapter *378 11 of the Bankruptcy Code, which was soon converted to a Chapter 7 liquidation. Bank of America filed documentation to prove that it lost over $75 million from the revolving loan agreement. Suprema’s investors were also victims of the scheme, as Suprema stock became almost worthless after the company liquidated.
The Government charged defendants with conspiracy, seventeen counts of bank fraud, nine counts of making false statements in reports required to be filed with the SEC, six counts of wire fraud, and four counts of mail fraud. Cocehiola was charged with an additional count of wire fraud.
Both defendants pled not guilty and proceeded to trial. The jury heard twenty-two days of testimony and convicted both defendants on all counts. The District Court sentenced Venechanos to 96 months imprisonment and Cocehiola to 180 months imprisonment. Defendants jointly challenge several rulings made at trial. Cocchiola challenges his sentence.[2] Also, Venechanos asserts that he was deprived of a fair trial due to misconduct by the prosecutors.[3]
II.
Because we write primarily for defendants, who are well aware of the relevant facts, we refer to those facts only as necessary in discussing their contentions. Defendants contend that they were denied a fair trial when the District Court granted the Government’s motion in limine to exclude defendants’ expert witness, Frederick Martens, who was to testify on “(1) the structure of an organized crime family within the Italian mafia, (2) the elements of a mafia bust-out scheme, and (3) [a co-conspirator’s] connection to the Bonanno crime family.” Cocehiola App. at 119-20. Martens’ proposed testimony would have explained to the jury the way in which “bust-out” schemes commonly involve infiltration by criminals into “position[s] of authority within a legitimate company to implement a fraudulent billing and invoicing scheme” with the assistance of various shell companies, for the purpose of looting the assets of the company and driving it into bankruptcy. Cocehiola App. at 120. Defendants assert that this testimony would have been significant because the fraud that occurred at Suprema was a classic “bust-out” scheme perpetrated without the knowledge of Cocehiola and Venechanos. Defendants argued that expert testimony about “bust-out” schemes generally would be “helpful to the jury in terms of understanding” that defendants were ignorant of the wrongdoing at Suprema. Cocehiola App. at 157.
The Government filed a motion in limine to exclude Martens’ testimony, arguing that there was no evidentiary basis to connect the case to organized crime, and that, in any event, testimony about “bust-out” schemes was irrelevant to the ultimate issue, which was defendants’ knowledge of and participation in the fraudulent scheme. *379 The Government further argued that even if Martens’ proposed testimony were relevant, its probative value would be substantially outweighed by its potential to confuse the jury.
The District Court granted the Government’s motion in limine, referring to Federal Rule of Evidence 702. It first determined that there was “insufficient evidence and, indeed, no admissible evidence which established] any relationship between the subject matter of [the] lawsuit and organized crime.” Cocchiola App. at 3-4. The District Court also concluded that Martens’ proposed testimony would not “assist the trier of fact to understand the evidence or to determine a fact in issue,” Cocchiola App. at 6, and that such testimony would likely confuse the jury.
Defendants argue that the District Court’s ruling was erroneous, and that the unjustness of the decision was enhanced when the Government “exploited [the] lack of evidence,” Cocchiola Br. at 25, by stating to the jury in its rebuttal summation, “[t]here’s ... no evidence really to tell us what a bust-out is.... ” Cocchiola App. at 360. The admission of expert testimony vel non falls within the broad discretion of the trial court, and we will reverse only for an abuse of discretion. See Pineda v. Ford Motor Co., 520 F.3d 237, 243 (3d Cir.2008).
We have no basis to disturb the District Court’s ruling. We agree with the District Court that a description of “bust-out” schemes generally would be unlikely to affect whether the jury believed defendants were either guilty participants in such a scheme or unwitting scapegoats. Also, the District Court’s concern with the potential for confusion that testimony about the mafia could engender was reasonable.
The argument that the Government exploited the lack of evidence on “bust-out” schemes is also unavailing because even without Martens’ testimony, defendants provided evidence and vehemently argued that defendants may have been victims of a “bust-out” scheme. For example, defendants made clear from the outset that they intended to prove that the fraud was hidden from them as much as it was hidden from the banks and investors. Defendants repeatedly questioned witnesses about the roles of others in the fraud. After hearing such evidence and argument, the jurors were qualified to determine, without the aid of expert testimony, whether the fraud was driven by outsiders and thus whether defendants’ theory of the case was credible.
Defendants next contend that the District Court abused its discretion in giving a Fioravanti instruction in response to a note from the jurors to the Court stating that, after deliberating for five days, they were “hopelessly deadlocked.”[4] Cocchiola *380 App. at 386. After receiving the note, the District Court summoned the parties to the courtroom to discuss their respective positions. Defense counsel moved for a mistrial. They argued that the note made clear “that further deliberations would not move [the jury’s] position[].” Cocchiola App. at 11.
Unsurprisingly, the Government disagreed. It suggested in lieu of declaring a mistrial that the Court give a supplemental Fioravanti charge, which the Court did. Even if defense counsels’ failure to object was not a waiver of their objections, see United States v. Graham, 758 F.2d 879, 883 (3d Cir.1985), defendants have no cause for complaint. The supplemental instruction the District Court gave was in essence identical to Third Circuit Model Criminal Jury Instruction § 9.05. That model instruction was drafted after Fioravanti and takes into consideration the concerns regarding jury coercion this court articulated in that case. See United States v. Brennan, 326 F.3d 176, 193 (3d Cir.2003) (holding that a supplemental instruction similar to that in the instant case did not “even [come] close to being coercive.”).
Both defendants challenge the District Court’s “willful blindness” instruction which allowed the jury to convict if it believed that the “evidence prove[d] beyond a reasonable doubt that a defendant deliberately closed his eyes to what would otherwise have been obvious to him.” Venechanos App. at 127. Defendants contend that there was insufficient evidence to warrant such an instruction and that the government’s theory was that defendants were guilty based on their direct knowledge of and participation in Suprema’s fraudulent activities. The defendants further assert that giving such an instruction erroneously “permits a civil standard of mental state such as negligence” to suffice for a criminal conviction. Venechanos Br. at 39. We disagree.
The Government did seek to prove actual knowledge by defendants, but it also presented evidence that could allow a jury to infer that defendants deliberately ignored the fraudulent dealings occurring at Suprema. The record before us thus contains sufficient evidence to warrant a willful ignorance instruction. Moreover, the Court’s instruction cautioned the jury not to convict based on a mens rea of negligence.[5]
In another claim that the District Court abused its discretion in connection with the jury instructions, defendants challenge the failure to give their requested instruction that if the jury found that they acted in subjective good faith, they must be found not guilty. The Government objected to this requested instruction, arguing that the instructions as a whole incorporated a description of the mens rea the jury was required to find in order to convict. The District Court agreed, finding that “in the context of this case” giving a good faith instruction would not “make [the necessary intent] any clearer, and in fact, [would] end[ ] up being pure surplus.” Supp.App. at 3728a-27. We agree.
In United States v. Leahy, we addressed this issue and held that “a district court *381 does not abuse its discretion in denying a good faith instruction where the instructions given already contain a specific statement of the government’s burden to prove the elements of a ‘knowledge’ crime.” 445 F.3d 634, 651 (3d Cir.2006) (citing United States v. Gross, 961 F.2d 1097, 1102-03 (3d Cir.1992)). The jury instructions in this case defined “knowingly” — clarifying that acts done “because of ... ignorance or mistake” could not suffice for a conviction. Supp.App. at 4235-36. Because this issue was squarely presented in Leahy, the District Court’s refusal to provide a “good faith” instruction under governing precedent was not an abuse of discretion.
Next, Venechanos argues that he was deprived of a fair trial because the Government did not provide defendants material from the hard drive of one of the Government’s most important witnesses, Arthur Christensen. Christensen had deleted “anything that was personal in [his] computer” in mid-December 2001 — more than a month before the Government obtained access to his computer. Supp.App. at 1771. Venechanos argues that the prosecution had an affirmative obligation under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), to expend the resources necessary to “see what exactly had been deleted” so as to determine whether it contained exculpatory evidence.[6] Venechanos Br. at 29. This contention lacks merit.
Brady and its progeny establish that a criminal defendant’s due process rights are violated when prosecutors fail to provide defense counsel with evidence that is material either to the defendant’s guilt or punishment. See Brady, 373 U.S. at 87, 83 5.Ct. 1194; see also United States v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); United States v. Perdomo, 929 F.2d 967, 969-70 (3d Cir.1991). However, the requirement that the Government disclose the material evidence in its possession is fundamentally different from placing an affirmative obligation on prosecutors to ferret out any potentially exculpatory evidence. Cf. United States v. Graham, 484 F.3d 413, 416-18 (6th Cir.2007) (government has no duty to investigate evidence under control of its cooperating witness); United States v. Merlino, 349 F.3d 144, 154 (3d Cir.2003) (no duty to learn information possessed by governmental agencies with no involvement in investigation). Venechanos did not seek the personal materials deleted from Christensen’s computer before or during trial, and prosecutors had no reason to believe such materials would have been relevant to Venechanos’ guilt or punishment. Indeed, Christensen testified that all the deleted material was personal and Venechanos never explained the way in which this evidence may have been exculpatory. See, e.g., United States v. Rouse, 410 F.3d 1005, 1010 (8th Cir.2005) (holding that there is no Brady violation where “defendants can only speculate” that the withheld evidence contained exculpatory information). Under these circumstances, we decline to establish the novel proposition that Brady requires the Government to forensically reconstruct material deleted from a hard drive before prosecutors have access to the computer.
We turn to Coechiola’s challenge to the District Court’s calculation of his sentence. Cocchiola argues that the District Court erred in imposing an eighteen-level upward adjustment based on the finding that the victims’ monetary loss associated with *382 his offenses amounted to over $80 million, and imposing a four-level upward adjustment based on the finding that he derived over $1,000,000 in gross proceeds from an offense which affected a financial institution.[7]
The District Court calculated the $80 million sum by adding Bank of America’s loss of $75,215,510 in the revolving loan agreement to the $43 million loss to investors after Suprema declared bankruptcy just months after the 2001 stock offering. The District Court stated that, because it could safely assume that at least $5 million of the loss to investors was caused by defendants’ unlawful conduct, it did not need “to engage in anything resembling analysis of loss causation as might be required in civil [10b — 5] litigation.” Supp. App. at 4417.
Cocchiola does not dispute the amount of loss, but rather the portion of that loss which is attributable to criminal acts. He argues “[ojnly money the banks lost from the portions of loans which were fraudulently obtained should have been used to determine the upward adjustment for loss under U.S.S.G. § 2Fl.l(b)(l)” and “only that portion of the loss which was ‘unlawfully taken’ may be used to determine the offense level.... ” Cocchiola Br. at 54, 57. We disagree.
The banks’ net loss was undisputedly over $75 million in the loan transaction, and there is evidence that the banks would not have provided loans to Suprema but for the fraudulent activity. Cocchiola asserts that “there was no evidence concerning how much of that $75 million actually involved money that had been ‘unlawfully taken.’” Cocchiola Br. at 52-53. Even assuming that Suprema entered into the revolving loan agreement before fraudulent activity began, the fraud went on for approximately eight years. Cocchiola offered no information by which the District Court could decipher what part of the $75 million was attributable to legitimately induced loans. Accordingly, under the Sentencing Guidelines, the District Court’s loss calculation was not error. See U.S.S.G. § 2F1.1 cmt. n. 9 (stating that, for offenses involving fraud, “the loss need not be determined with precision ---- [t]he court need only make a reasonable estimate of the loss, given the available information”) (emphasis added).
As for the $43 million securities loss, the District Court was correct to conclude that the 2001 stock offering would never have occurred but for the fraud. Mitchell Pinheiro, an executive at Janney Montgomery, the investment firm which underwrote that stock offering, testified that his firm “would not have performed the underwriting for” Suprema in 2001 had it known of the fraud. Supp.App. at 568.
Finally, Cocchiola argues that his sentence was too harsh because he did not derive more than $1 million in gross receipts from his offense, as some of the proceeds were not “attributable to the fraud.” Cocchiola Br. at 62. The definition of “gross receipts from the offense” under U.S.S.G. § 2F1.1(b)(7)(B) “applies ‘even if the defendant receives the million dollars in an indirect manner.’ ” United States v. Bennett, 161 F.3d 171, 192 (3d Cir.1998) (quoting United States v. Monus, 128 F.3d 376, 397 (6th Cir.1997)).
Cocchiola collected $2.5 million from the sale of Suprema stock, the price of which was enhanced by bank fraud. Moreover, he received a salary of $250,000 per year for fiscal years 1999-2001 and bonuses to *383 taling over $1.5 million for those years, all from a company that was supported largely by illegal loans. Cocchiola seems to argue that the District Court was required to parse each of his gross receipts to determine its precise source. He cited and we found no decisions requiring as much.
III.
For the above-stated reasons, we will affirm the District Court’s judgments and sentence.

. The District Court had jurisdiction under 18 U.S.C. § 3231. This court has jurisdiction over the challenges to defendants’ convictions under 28 U.S.C. § 1291, and over Cocchiola’s challenge to his sentence under 18 U.S.C. § 3742(a).

. Venechanos states in his brief that he "joins with and incorporates each and every issue contained in the ... brief submitted on behalf of ... Cocehiola." Venechanos Br. at 48. However, he did not submit a transcript from his sentencing hearing, his PSR, or a reply brief with a discussion of sentencing. Assessing whether he may be entitled to re-sentencing is impossible on the record before us. See United States v. Harris, 932 F.2d 1529, 1533 (5th Cir.1991) (defendants cannot join arguments of co-defendants on appeal where determinations are fact specific as to each). Accordingly, we agree with the Government that Venechanos waived his ability to challenge his sentence.

. Cocehiola filed a letter with this court under Federal Rule of Appellate Procedure 28(i), in which he joined most of the assertions in Venechanos' brief. Cocehiola declined, however, to join Venechanos’ arguments concerning prosecutorial misconduct.

. In United States v. Fioravanti, this court held that a jury instruction is unduly coercive when it encourages jury members who are in the minority during deliberations to reconsider their views in light of their minority status. 412 F.2d 407, 416 (3d Cir.1969).
We instead urged district courts to employ the following charge:
It is your duty, as jurors, to consult with one another, and to deliberate with a view to reaching an agreement if you can do so without violence to individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence in the case with your fellow jurors. In the course of your deliberations, do not hesitate to re-examine your own views, and change your opinion, if convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict.
Id. at 420 n. 32 (quoting W. Mathes & E. Devitt, Federal Jury Practice and Instructions, § 79.01 (1965)).

. The instructions included the following:
[Y]ou may not find that a defendant knew that these representations about Suprema were false if you find only that the defendant ... should have known that these representations were false or that a reasonable person would have known of a high probability of this fact. It is not enough that a defendant may have been stupid or foolish or may have acted out of inadvertance or accident. You must find that the defendant ... was actually aware of a high probability that these representations about Suprema were false, deliberately avoided learning about it and did not actually believe they were true.
Venechanos App. at 128

. Venechanos complains that the Government's failure to disclose whatever evidence was deleted from Christensen’s hard drive hindered his ability to cross examine Christensen. But this is unconvincing because Venechanos’ counsel questioned Christensen at length about deleting files from his hard drive.

. The District Court sentenced both defendants under the 1998 version of the Guidelines under this court's decision in United States v. Bertoli, 40 F.3d 1384, 1404 (3d Cir. 1994). That decision is not at issue on this appeal. Accordingly, all citations to the Guidelines in this opinion are to the 1998 Manual.