# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
TOZZI, CAMPANELLA, and CELTNIEKS
Appellate Military Judges

**UNITED STATES, Appellant**
**v.**
**Major MICHAEL F. STELLATO**
**United States Army, Appellee**

ARMY MISC 20140453

Headquarters, Fort Bliss
Timothy P. Hayes, Military Judge

For Appellee: Captain Robert H. Meek, III, JA (argued); Colonel Kevin Boyle, JA; Lieutenant Colonel Jonathan F. Potter, JA; Captain Robert H. Meek, III, JA (on brief).

For Appellant: Captain Janae M. Lepir, JA (argued); Colonel John P. Carrell, JA; Lieutenant Colonel James L. Varley; JA, Major Kenneth W. Borgnino, JA (on brief).

17 November 2014

---
OPINION OF THE COURT AND ACTION ON APPEAL
BY THE UNITED STATES FILED PURSUANT TO
ARTICLE 62, UNIFORM CODE OF MILITARY JUSTICE
---

TOZZI, Senior Judge:

Appellee is charged at a general court-martial with one specification of rape of a child, three specifications of aggravated sexual contact with a child, one specification of indecent liberties with a child, and one specification of sodomy with a child under the age of 12, in violation of Articles 120 and 125, Uniform Code of Military Justice, 10 U.S.C. §§ 920, 925 (2006 & Supp. I 2008) [hereinafter UCMJ]. This case is before this court pursuant to a government appeal of the military judge's ruling in accordance with Article 62, UCMJ.

At trial, the military judge dismissed the charges and specifications with prejudice as a remedy for what the military judge called "continual and egregious" discovery violations. On appeal, the government claims that the military judge abused his discretion both by finding discovery violations and by imposing the remedy of dismissal with prejudice. Upon review of the record pursuant to Article

62, we conclude that the military judge based his ruling upon an erroneous view of the law and, accordingly, abused his discretion.

## JURISDICTION

As a threshold matter, we must determine whether we have jurisdiction to hear this case. Article 62, UCMJ, permits this court to consider government appeals of "[a]n order or ruling of the military judge which terminates the proceedings with respect to a charge or specification." UCMJ art. 62(a)(1)(A). Within 72 hours, the government must provide the military judge with written notice of appeal from the order or ruling, which must include a certification that the appeal is not being taken for purpose of delay. UCMJ art. 62(a)(2). Here, the military judge in this general court-martial ordered that the charges be dismissed with prejudice on 20 May 2014. On 22 May 2014, the government provided timely notice of appeal of the military judge's order and certified that the appeal is not being taken for the purpose of delay. Accordingly, we have jurisdiction under Article 62 to consider this government appeal.

## BACKGROUND

This interlocutory government appeal arises from the military judge's dismissal of all charges and specifications with prejudice. The military judge entered extensive findings of facts and conclusions of law, which we set forth below.[1]

### a. The Military Judge's Findings of Fact

This case involves purported discovery violations over the course of several months. The accused, a mobilized reservist, is charged with various acts of molesting his biological daughter, MS, from 2007 through 2009. At that time, MS was between less than three years and less than five years of age. The accused was interviewed in Afghanistan on 29 October 2012 regarding these allegations. In November 2012, his command redeployed the accused back to the United States. His demobilization station has been at all relevant times Fort Bliss, Texas.

---

[1] The military judge's extensive findings of fact are not clearly erroneous. As such, we adopt those findings. However, because the military judge styled his factual findings in numbered paragraphs, used internal record citations, and referred to witnesses by their full names, we have stylistically modified his ruling rather than quote it verbatim.

The original trial counsel in this case was Captain (CPT) KJ, and the assistant trial counsel was CPT FC, the Special Victim Prosecutor. Captain KJ was responsible for responding to discovery requests and communicating with Mrs. MS, the alleged victim's mother.[2]

On approximately 9 February 2013, Mrs. MS, with the assistance of friends, compiled what witnesses described as a "box" of evidence relating to this case.[3] Mrs. MS had compiled this evidence over several years since the allegations were first made and kept it in a large, color-coded binder several inches thick. She kept this binder in a green plastic file box, which she kept on the kitchen table in her home. Mrs. MS and MS live in Morgantown, West Virginia.

Later that month, between 25 and 27 February 2013, CPT KJ and CPT FC traveled to Morgantown to meet Mrs. MS and MS. The first meeting occurred at one of MS's therapy appointments and later continued at the home of Mrs. MS and MS.

The military judge found CPT KJ became aware of the "box" of evidence in late February or early March 2013 after he visited MS and Mrs. MS with CPT FC. Mrs. MS testified that she referred to this evidence and showed the binder to CPT KJ while in her kitchen. At that point, CPT FC was in the basement entertaining MS. Captain KJ cautioned Mrs. MS that any evidence that she provided to him would have to be turned over to the defense, so if she had questions she should "ask ahead of time." Mrs. MS testified that she did not take that statement to mean that she should not provide the evidence to the government, but that she should be aware it would be disclosed to the defense.

As part of his initial discussion, CPT KJ instructed Mrs. MS that the government would need anything that was "relevant." Captain KJ did not define relevance, nor did he attempt to secure the "box" of evidence when he learned of it.[4] He did not tell Mrs. MS to preserve it, although Mrs. MS intuitively understood that she should not destroy anything. Captain KJ did not follow up with her to ensure that she had provided everything to him, but stated that he was "under the impression" that he had everything. He never disclosed to the defense that there was

---

[2] The alleged victim and her mother have the same initials. We distinguish the two by referring to the child as MS and the mother as Mrs. MS.

[3] The military judge's ruling often placed quotations around the word "box." Accordingly, we will do the same here.

[4] The "box" ultimately remained in West Virginia in the possession of Mrs. MS until March 2014.

a "box" of evidence being held by Mrs. MS and does not recall if he even told CPT FC about the "box." Captain KJ told CPT FC that Mrs. MS would provide a "thumb drive." When CPT FC left West Virginia, she was unaware of the existence of the "box" and remained unaware of its existence until March 2014.

Charges were preferred on 13 March 2013. The government contemporaneously provided some initial discovery to the defense, including six DVDs. When the civilian defense counsel received this discovery, one DVD was blank, one was corrupted, three would not run, and one was missing ten minutes of audio from a forensic interview. The government later provided uncorrupted copies. Although some of the corruption may have occurred at the local Trial Defense Services office, the government acknowledges that at least one DVD was corrupted when delivered.

On 22 March 2013, the defense filed its first discovery request, requesting, among other items, exculpatory evidence; impeachment evidence; evidence within the possession of the government that is material to the preparation of the defense; results of physical and mental examinations (including Mrs. MS's medical and mental examinations); all previous oral and written statements made by a prosecution witness to include notes, writings used to prepare for trial, prior inconsistent statements, email, and text message communications by Mrs. MS in relation to this case; prior statements from the accused; and a request to preserve evidence. Although CPT KJ later testified that this request was "very generic," the military judge specifically found that this discovery request included several very specific requests pertaining to personal, medical, and mental health records of Mrs. MS; email messages between Mrs. MS and the accused; and statements from MS. Captain KJ, his chief of military justice, and the senior trial counsel decided that the discovery request would not be answered right away, but would be responded to "closer to referral." However, CPT KJ began collecting evidence at this time. He also testified that he never told anyone, such as Mrs. MS or various law enforcement agencies that had investigated the allegations in multiple jurisdictions, to "preserve evidence."

While testifying about the "box," Mrs. MS said that CPT KJ never went through the "box" to make sure he had everything, nor did he show her the defense discovery request or give her a list of evidence she needed to provide. He never asked her whether she had received mental health treatment until she voluntarily disclosed it to him, despite the specific defense discovery request. She also testified that CPT KJ never asked if MS made an inconsistent statement, which she had. Additionally, CPT KJ never told Mrs. MS to provide her journals containing information about the case. The military judge found that CPT KJ was aware that Mrs. MS at one time possessed emails from her husband that had been specifically requested in discovery and failed to both notify the defense that they at one time existed and ensure that they were retrieved and provided to the defense. The

4

military judge reasoned that given the fact that Mrs. MS eventually produced the emails in March 2014, that with minimal diligence the emails would have been available well before March 2014.

The initial partial disclosure of the evidence in the "box" occurred when Mrs. MS sent select documents to CPT KJ in the mail on a thumb drive or flash drive, which CPT KJ testified "may have been prior to preferral." It was not clear until the third continuance in March 2014 (when previously undisclosed emails were provided to the defense) that the thumb drive did not contain all the evidence in the possession of Mrs. MS. Furthermore, the thumb drive was turned over to the 1st Armored Division G-6 to identify its contents. The G-6 gave printed documentation of its contents to CPT KJ, but refused to return the thumb drive from Mrs. MS and stated that it had been destroyed because it had been connected to the 1st Armored Division domain. Captain KJ stated that he acquired another thumb drive from Mrs. MS a few weeks later and took it home and copied the contents to a disk and then returned the thumb drive to the prosecution file. It is unclear when and where this thumb drive was created, as Mrs. MS stated that she created two thumb drives, and the second one remained in her possession until after the third continuance in March 2014. The military judge stated that he had no way of ascertaining if the printed documents comprised everything that was stored on the thumb drives, or if the first and second thumb drives were mirror images of one another, or if there were only two thumb drives. All that can be said with certainty is that all of the evidence in the "box" did not make its way onto the thumb drive that was provided to defense in documentary form.

On 8 May 2013, the accused waived his right to an Article 32 hearing. On 24 June 2013, the government provided disclosures required pursuant to Military Rule of Evidence [hereinafter Mil. R. Evid.] 304(d)(1), commonly known as Section III disclosures. On 27 June 2013, the convening authority referred this case to a general court-martial.

On 9 July 2013, the government represented to the military judge that it would be ready for trial on 5 August 2013. That same day, the government provided its first written discovery response, which included the disclaimer that while all writings used to prepare for trial had been provided, "[d]efense may want to ask again" as trial nears. The military judge docketed the case for 17 September 2013.

Before the first trial date, the defense requested a continuance due to incomplete discovery. On 20 August 2013, the defense filed a motion to compel discovery, where one of the items sought was a plastic banana that had been seized as evidence, apparently by the Allen County, Indiana Sheriff's Department. MS had indicated that, while in her home, she was penetrated with something that felt like a banana. A detective in that office had initially told CPT KJ that he was not sure that he still had the banana and later that the only evidence the detective still had was the

police report and two interviews. When the defense requested the banana, the government responded that the defense was not entitled to "lost evidence." When the military judge ordered the government to search for the banana, it was located in the Sheriff's Department's evidence locker. Ultimately, DNA tests were run on the banana, and that banana contained the DNA of MS and the DNA of an unknown male, but not the accused's DNA.

The defense's continuance request also addressed the production of Ms. LE. The government's response to this continuance request denied production of Ms. LE because she was not "part of the charged offense." MS stated that Ms. LE was present for some of the alleged offenses and was also victimized by the accused. When the court ordered a forensic interview of Ms. LE, she denied ever being victim to any sexual offenses and had only a vague recollection of the victim. Although the military judge did not indicate when he ordered the forensic interview of Ms. LE, it is uncontroverted and uncontested that the interview occurred after the government denied production of her as a witness.

On 26 August 2013, the military judge granted the defense's continuance request and docketed the case for a 10 December 2013 trial date. On 16 September 2013, the accused was arraigned, and he deferred entry of his pleas. In a written ruling on 17 September 2013, the military judge cautioned the government that their decision to "take a hard stand on discovery . . . invites disaster at trial." Captain KJ testified that he continued his efforts to provide discovery based on "what [he] deemed relevant and necessary." In his words, he "considered" the military judge's warning but "chose not to go through any further delineation of what was provided."

Captain KJ acknowledged that he made a statement in front of the Chief of Client Services in the presence of civilian defense counsel that the civilian defense counsel was "defending rapists" and had sent an email to the civilian defense counsel that, in effect, stated that she was "defending the guilty."

On 26 November 2013, the defense moved for a second continuance based on incomplete discovery. The military judge denied the continuance but ordered the government to comply with new discovery deadlines and granted the defense additional time to file motions based on new discovery. The defense filed a motion to compel additional discovery which the military judge granted. On the eve of trial in December 2013, the military judge granted a second continuance primarily due to the continued inability of the government to secure two defense witnesses, despite the fact that some government witnesses had already traveled to Fort Bliss for trial. The case was docketed a third time with a 18 March 2014 trial date. Mrs. MS's medical records, which the military judge had ordered for an in camera review, continued to be provided to the military judge from January 2014 through early March 2014.

Captain KJ and his wife went to dinner with Mrs. MS and MS in December 2013 in El Paso, Texas, and Mrs. MS is "pretty sure" she paid for the dinner, although CPT KJ testified that he and his wife took Mrs. MS and MS to dinner. Mrs. MS gave a gift to CPT KJ to celebrate the pending birth of a child, but CPT KJ was unaware of the gift, due to his deployment, until after it was provided.

On about 5 March 2014, the new trial counsel, CPT BH, disclosed to the defense that Mrs. MS had revealed to him during a recent interview that MS had at one time recanted an allegation immediately after making it. Captain FC was not aware of the recantation prior to this time. Mrs. MS wrote the recantation down when it happened and that note, or a portion of it, was provided to the defense on approximately 10 March 2014.

On 17 March 2014, the military judge held a Rule for Courts-Martial [hereinafter R.C.M.] 802 conference, where the defense requested a third continuance for what the military judge called "the following non-exclusive reasons." First, the government had informed the defense that Mrs. MS had at least two journals that she kept with details of the case that she was using to prepare for trial that had not been and would not be provided to the defense because Mrs. MS did not bring them to trial but brought only selected scanned pages. Mrs. MS confirmed that no one ever asked her or told her to bring the journals or the "box" or binder of evidence to Fort Bliss.

Second, the government had just provided in the R.C.M. 802 conference, witnessed by the military judge, emails between the accused and Mrs. MS in which the accused made statements directly contradicting the allegations as well as Mrs. MS's statements that the accused had never denied the allegations. The defense had specifically requested these emails in its initial discovery request on 22 March 2013. Mrs. MS stated that she had previously provided the emails, but later acknowledged that she had inadvertently not provided the emails to the government prior to March 2014.

Third, the government revealed to the defense and the military judge in the R.C.M. 802 conference that there was a "box" of information in the possession of Mrs. MS that had not been provided to the government, let alone disclosed to the defense, and would not be available for trial as it was still in West Virginia. This was the first time the "box" had been disclosed to the defense or the military judge, despite the defense receiving some of its contents in piecemeal discovery after being scanned by a friend of Mrs. MS and forwarded on a thumb drive to the government. The military judge granted the defense's request for continuance, and the trial was docketed for a fourth time for 8 July 2014.

The "box" of evidence was not produced until after the third continuance when CPT FC and her paralegal traveled to West Virginia to inventory the "box" and

7

its contents.  Captain FC told Mrs. MS at that time that she needed to provide everything she had, "whether she thought it was relevant or not."

The military judge specifically found that Mrs. MS is "clearly" and "understandably" very personally and emotionally involved in the case.  She had recorded conversations between herself and the accused with equipment she bought at a store called the "Spy Shop" in Fort Wayne, Indiana, at the behest of Fort Wayne law enforcement personnel.  She asserted that all those recordings have been provided to the government.  Throughout 2013, she developed a strong rapport with CPT KJ.  Captain FC requested that CPT KJ provide her feedback on his progress with the case relative to discussions with Mrs. MS, but was repeatedly rebuffed to the point where she brought her concerns to both the former and current chief of military justice.  Regarding the discovery provided by Mrs. MS, CPT KJ testified that he did not plan on sitting down with her until the week before trial to discover all the information that she knew.

The military judge found that the three continuance requests were all attributable to the government's failure to produce witnesses or documentary evidence.  The military judge noted that the fourth trial date was ten months after the first trial date.  He further calculated that 461 days would elapse between charges being preferred and the fourth trial date.  The military judge attributed 421 of those days to the government.  Since redeploying, the accused has been at Fort Bliss with an administrative flag in place.  He had been removed from the lieutenant colonel promotion list.  The accused is prohibited from drinking alcohol, has to sign in and out when leaving post, and is unable to secure a vehicle.  He lives in a barracks which houses enlisted soldiers and is required to walk to the dining facility for meals.

On 2 April 2014, the defense filed a motion to dismiss with prejudice due to prosecutorial misconduct in the form of repeated discovery violations.  The military judge conducted Article 39(a) sessions addressing this motion on 29-30 April 2014 and on 16 May 2014.

### b.  The Military Judge's Analysis and Conclusions

After finding the preceding facts, the military judge cited Article 46, UCMJ, which provides that the parties shall have equal opportunity to obtain witnesses and other evidence.  The military judge generally noted that R.C.M. 701 provides "specific guidance to trial and defense counsel regarding their discovery obligations."  He also noted that R.C.M. 701(g)(3) provides remedies a military judge might impose for failure to comply with discovery violations, including orders permitting discovery, granting continuances, limiting the evidence presented by the parties, and "such other order as is just under the circumstances."

The military judge noted that he issued orders compelling discovery of either witnesses or documentary evidence on at least six occasions, many of those orders requiring multiple disclosures. The military judge granted three defense continuance requests, two on the eve of trial after witness travel had commenced, for what the military judge called "continuing discovery violations." He noted that limitations on the presentation of evidence would not be helpful because much if not all the evidence at issue is favorable to the defense. The military judge determined that he was left to fashion a remedy that was "just under the circumstances."

The military judge then noted that defense styled their motion as a motion to dismiss for prosecutorial misconduct. The military judge then discussed the law of prosecutorial misconduct and noted that dismissal could be a remedy. However, the military judge also noted that he should impose the least severe sanction that will accomplish prompt and full compliance with discovery orders.

The military judge stated that in this case, "the discovery violations have been continual and egregious." He specifically cited the government's failure to disclose the "box" of evidence that included written denials by the accused and recantations by MS. The military judge found that the government "knew that the box existed[,]" but failed to secure it, and failed to ensure that the entirety of its relevant contents were provided to the defense, and failed to disclose the existence of the "box" until the eve of the third trial date.

The military judge held that the government violated R.C.M. 701(a)(2)(A) in regards to the "box" and the plastic banana. That rule governs discovery of items "within the possession, custody, or control of military authorities, and which are material to the preparation of the defense . . . ." The military judge held that the government exercised control over the plastic banana by seizing it from the Allen County Sheriff's Department and having it tested upon court order. Further, the military judge reasoned that "the fact that [CPT FC] was able to seize the 'box' of evidence in March 2014 indicates that [CPT KJ] had the ability to do so in February 2013 or any time thereafter." The military judge noted that both the banana and the "box" of evidence were exculpatory, specifically identifying the lack of the accused's DNA on the banana and Mrs. MS's note taken when MS recanted her allegation. The military judge noted that R.C.M. 701(a)(6)(A) requires disclosure as soon as practicable of evidence favorable to the defense which reasonably tends to negate guilt. However, the military judge did not expressly find a violation of that rule.

The military judge stated that the government "took a recklessly cavalier approach to discovery." The military judge then described several failures in regards to discovery. First, the military judge again noted the exculpatory nature of the "plastic banana alleged to have been lost or destroyed which the [g]overnment refused to investigate until ordered to do so by" the military judge. Second, the

military judge noted the "exculpatory" emails "withheld, intentionally or inadvertently, by the accused's wife . . . ." Third, the military judge noted that the defense only learned on the eve of the third trial that evidence "was being filtered piecemeal by [Mrs. MS] to the [g]overnment was originally stored in a color-coded binder in a box in the possession of Mrs. [MS], known for over a year by the [g]overnment to contain material evidence." Fourth, the military judge noted that the government refused to produce a material alleged eyewitness, Ms. LE, who denied the offenses ever occurred.

The military judge found prejudice primarily because a "key witness" for the defense, Dr. K, had died after the most recent continuance and was not able to be deposed before his death. He had interviewed MS and Mrs. MS shortly after the allegations first came to light.[5] The military judge also found prejudice because the delays have prevented the accused's career progression, thwarted his ability to communicate with his family to resolve custody issues, and resulted in "extreme and unwarranted" restrictions such as being relegated to an enlisted barracks, being denied the ability to purchase a vehicle absent an exception to policy, being required to sign in and out to leave post, and being prohibited from drinking alcohol.

The military judge determined that multiple continuances could only partially remedy the above prejudices, and "calls into serious question as to whether the accused can ever receive a fair trial given the evidence that has already been lost, unaccounted for, or left to the devices of an interested party." The military judge determined that the remedy of further continuances had been "exhausted" because each continuance brought additional disclosures of exculpatory evidence. The military judge determined that further continuances only serve to help the government perfect its case, while frustrating the accused's ability to have his day in court while suffering under significant restrictions that "serve no legitimate [g]overnment objective in this case." Although the defense suggested permitting an Article 32 hearing, the military judge determined that remedy would only extend the "languishing" of the case and allow the government to right its wrongs.

The military judge further determined that he could not remove CPT KJ from the case because he was no longer the trial counsel. The military judge also found that removing CPT FC would not be necessary or remedial because she was not responsible for the discovery in this case. Lastly, the military judge determined that

---

[5] The military judge noted that Dr. K's records of interviews are not available. However, the military judge earlier found that the report was discovered, but that his interview notes were not. We assume that the military judge used records and notes interchangeably.

withholding evidence was not an appropriate remedy because the tardily disclosed evidence was exculpatory in nature.

In deciding to dismiss the case, the military judge found no legitimate reason for what he called the government's violations. The military judge noted "[b]y leaving discovery to the whims of interested parties or law enforcement agencies, refusing to make a key eyewitness available for an interview, and failing to respond to the most basic discovery requests such as the request to preserve evidence or determine the existence of mental health records, unless ordered to do so by the [military judge], the obligations of R.C.M. 701 have been systemically ignored."

The military judge, noting the length of the delay, analyzed the case to determine whether a constitutional speedy trial violation occurred. Because the accused had not raised a speedy trial claim, the military judge found no such violation.

However, the military judge determined that "based solely on the nature, magnitude, and consistencey of the discovery violations in this case, this is the very rare case where dismissal is an appropriate remedy. As dismissal without prejudice only gives the [g]overnment the opportunity to reset and perfect its case, and offers no remedy for the material prejudice and denial of due process already inflicted upon the [a]ccused, the only appropriate remedy left in this case is dismissal with prejudice. Being able to reach this conclusion based on the violations of R.C.M. 701 alone, the Court declines to make a finding of prosecutorial misconduct in this case."

## LAW AND DISCUSSION

### a. Standard of Review

When ruling on government interlocutory appeals made pursuant to Article 62(b), we "may act only with respect to matters of law." We may not make additional findings of fact; rather, "[o]n questions of fact, [our] court is limited to determining whether the military judge's findings are clearly erroneous or unsupported by the record." *United States v. Lincoln*, 42 M.J. 315, 320 (C.A.A.F. 1995) (quoting *United States v. Kosek*, 42 M.J. 60, 64 (C.M.A. 1994)). We are "bound by the military judge's factual determinations unless they are unsupported by the record or clearly erroneous." *United States v. Gore*, 60 M.J. 178, 185 (C.A.A.F. 2004).

As such, we review a military judge's decision to dismiss charges and specifications for an abuse of discretion. *See United States v. Bowser*, __ M.J. ___, 2014 CCA LEXIS 764, at *15 (A.F. Ct. Crim. App. 3 Oct. 2014) (citations omitted). Our superior court has "long held that dismissal is a drastic remedy and courts must

11

look to see whether alternative remedies are available . . . . When an error can be rendered harmless, dismissal is not an appropriate remedy . . . . [D]ismissal of charges is appropriate when an accused would be prejudiced or no useful purpose would be served by continuing the proceedings." *United States v. Gore*, 60 M.J. 178, 187 (C.A.A.F. 2004) (citations omitted). "The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion. The challenged action must be 'arbitrary, fanciful, clearly unreasonable, or clearly erroneous.'" *United States v. White*, 69 M.J. 236, 239 (C.A.A.F. 2010) (quoting *United States v. Lloyd*, 69 M.J. 95, 99 (C.A.A.F. 2010) (citations and quotation marks omitted)). The abuse of discretion standard of review recognizes that a judge has a range of choices and will not be reversed so long as the decision remains within that range. *Gore*, 60 M.J. at 187 (citing *United States v. Wallace*, 964 F.2d 1214, 1217 n.3 (D.C. Cir. 1992)). "An abuse of discretion means that 'when judicial action is taken in a discretionary manner, such action cannot be set aside by a reviewing court unless it has a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors. *Id.* (quoting *United States v. Houser*, 36 M.J. 392, 397 (C.M.A. 1993) (citations omitted)).

### b. Discovery Obligations in the Military Justice System

"A military accused . . . has the right to obtain favorable evidence under Article 46, UCMJ . . . , as implemented by R.C.M. 701-703." *United States v. Coleman*, 72 M.J. 184, 186-87 (C.A.A.F 2013). It is well-established that "Article 46 and its implementing rules provide greater statutory discovery rights to an accused than does his constitutional right to due process." *Id.* at 187 (citing *United States v. Roberts*, 59 M.J. 323, 327 (C.A.A.F. 2004); *United States v. Hart*, 29 M.J. 407, 409-10 (C.M.A. 1990)). As our superior court noted in *Roberts*:

> Discovery practice under Article 46 and R.C.M. 701 "promote[s] full discovery . . . eliminates 'gamesmanship' from the discovery process" and is "quite liberal . . . . Providing broad discovery at an early stage reduces pretrial motions practice and surprise and delay at trial." *Manual for Courts-Martial, United States* (2002 ed.), Analysis of Rules for Courts-Martial A21-32. The military rules pertaining to discovery focus on equal access to evidence to aid the preparation of the defense and enhance the orderly administration of military justice. To this end, the discovery practice is not focused solely upon evidence known to be admissible at trial. *See United States v. Stone*, 40 M.J. 420, 422 (C.M.A. 1994)(citing *United States v. Lloyd*, 992 F.2d 348, 351 (D.C. Cir. 1993)). The parties to a court-martial should evaluate

> pretrial discovery and disclosure issues in light of this
> liberal mandate.

59 M.J. at 325.[6]

Two discovery rules are most relevant to this appeal. First, R.C.M. 701(a)(2) addresses various items within the possession, custody, or control of military authorities and material to the preparation of the defense.

> (2) *Documents, tangible objects, reports.* After service of
> charges, upon request of the defense, the Government
> shall permit the defense to inspect:
>
> (A) Any books, papers, documents, photographs, tangible
> objects, buildings, or places, or copies of portions thereof,
> *which are within the possession, custody, or control of
> military authorities, and which are material to the
> preparation of the defense* or are intended for use by the
> trial counsel as evidence in the prosecution case-in-chief
> at trial, or were obtained from or belong to the accused;
> and
>
> (B) Any results or reports of physical or mental
> examinations, and of scientific tests or experiments, or
> copies thereof, *which are within the possession, custody,
> or control of military authorities, the existence of which is
> known or by the exercise of due diligence may become
> known to the trial counsel, and which are material to the
> preparation of the defense* or are intended for use by the
> trial counsel as evidence in the prosecution case-in-chief
> at trial.

(Emphasis added). We note that R.C.M. 701(a)(2)(B) places an additional burden of due diligence on the trial counsel.

Second, R.C.M. 701(a)(6) sets forth specific requirements with respect to "[e]*vidence favorable to the defense*":

---

[6] The 2012 edition of the *Manual for Courts-Martial, United States* [hereinafter *MCM*] includes the same quoted language.

> (6) *Evidence favorable to the defense.* The trial counsel
> shall, as soon as practicable, disclose to the defense the
> existence of evidence known to the trial counsel which
> reasonably tends to:
>
> (A) Negate the guilt of the accused of an offense charged;
>
> (B) Reduce the degree of guilt of the accused of an
> offense charged; or
>
> (C) Reduce the punishment.

"The foregoing provision implements the Supreme Court's decision in *Brady v. Maryland*, 373 U.S. 83, 87 . . . (1963)." *United States v. Williams*, 50 M.J. 436, 440 (C.A.A.F. 1999) (citations omitted). "[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). The term "others acting on the government's behalf in the case" generally applies to governmental entities. *See Williams*, 50 M.J. at 441 (applying the due diligence standard to "governmental files beyond the prosecutor's own files."); *see also United States v. Graham*, 484 F.3d 413, 417 (6th Cir. 2007) ("'*Brady* clearly does not impose an affirmative duty upon the government to take action to discover information which it does not possess.' . . . [C]ooperating witnesses . . . stand in a very different position in relation to the prosecution than do police officers and other governmental agents.") (quoting *United States v. Beaver*, 524 F.2d 963, 966 (5th Cir. 1975)).

In interpreting the outer parameters of R.C.M. 701(a)(6), our superior court in *Williams* noted

> [t]he scope of the due-diligence requirement with respect
> to governmental files beyond the prosecutor's own files
> generally is limited to: (1) the files of law enforcement
> authorities that have participated in the investigation of
> the subject matter of the charged offenses, (2)
> investigative files in a related case maintained by an entity
> "closely aligned with the" prosecution, and (3) other files,
> as designated in a defense discovery request, that involved
> a specified type of information within a specified entity.

50 M.J. at 441 (citations omitted). The court also noted that these issues are resolved on a "case-by-case" basis. *Id.* "To the extent that relevant files are known to be under the control of another governmental entity, the prosecution must make that fact known to the defense and engage in 'good faith efforts' to obtain the

material." *Id.* (citing Standard 11-2.1(a), Commentary, American Bar Association, Criminal Justice Discovery Standards 14 n.9 (3d ed. 1995)).

A third discovery rule, R.C.M. 701(g)(3), gives the military judge authority to take action regarding discovery violations brought to his attention. "A military judge may take one or more of the following actions:

> (A) Order the party to permit discovery;
>
> (B) Grant a continuance;
>
> (C) Prohibit the party from introducing evidence, calling a witness, or raising a defense not disclosed; and
>
> (D) Enter such other order as is just under the circumstances. This rule shall not limit the right of the accused to testify in the accused's behalf.

While not dispositive, the lack of dismissal as an express remedy under this Rule indicates the drastic nature of that remedy.

### c. Whether The Military Judge Abused His Discretion

After reviewing the record and according due deference to the military judge, we are convinced that he based his ruling on an erroneous view of the law for two reasons. First, the military judge's view of the government's discovery obligations exceeded the government's obligations required by the Constitution, statutes, and regulations. Second, in light of this erroneous view of the law, his decision to dismiss the charges and specifications with prejudice was an abuse of discretion. We address each purported discovery violation in turn and then address the military judge's remedy of dismissal with prejudice.

### 1. The Plastic Banana

The military judge abused his discretion by finding a discovery violation regarding the plastic banana. Specifically, he found a violation of R.C.M. 701(a)(2)(A) when "the [g]overnment exercised control over the banana by seizing it from the Allen County Sheriff's Department and having it tested upon court order." That rule applies to "tangible objects . . . which are within the possession, custody, or control of *military authorities*." (emphasis added). Once military authorities gained control of the banana, they had it tested and turned over the resulting information to the defense. Put another way, R.C.M. 701(a)(2)(A) was not at issue so long as the banana was in the possession of the Allen County Sheriff's

Department. Once the banana came into the military's possession, the military complied with that rule's requirements.

The more precise question, which the military judge did not analyze, was whether the trial counsel violated R.C.M. 701(a)(6) by relying on a detective's assertion "that the only evidence the detective still had was the police report and two interviews." We assume without deciding that the trial counsel erred by relying on the Allen County Sheriff's Department representation.[7] However, "[d]elayed disclosure of evidence does not in and of itself constitute a *Brady* violation." *United States v. O'Hara*, 301 F.3d 563, 569 (7th Cir. 2002). Courts "have never interpreted due process of law as requiring more than that *Brady* material must be disclosed in time for effective use at trial." *United States v. Coppa*, 267 F.3d 132, 142 (2d Cir. 2001). Thus, to the extent that the accused suffered a discovery violation regarding the plastic banana, he is now fully able to use all that potentially exculpatory evidence at trial.

## 2. The "Box" of Evidence

We also conclude that the military judge abused his discretion regarding the "box" of evidence. We reach this conclusion by using a two-step analysis.[8] First, we must determine whether the trial counsel disclosed the evidence in the

---

[7] *See Kyles*, 514 U.S. at 438 (rejecting the argument that *Brady* does not apply to information known to the police but not the prosecutor). We cannot, based on this record, determine the question of cross-jurisdiction constructive knowledge. When addressing cross-jurisdiction constructive knowledge, the following issues addressed include: "(1) whether the party with knowledge of the information is acting on the government's 'behalf' or is under its 'control'; (2) the extent to which state and federal governments are part of a 'team,' are participating in a 'joint investigation' or are sharing resources; and (3) whether the entity charged with constructive possession has 'ready access' to the evidence." *United States v. Risha*, 445 F.3d 298, 304 (3d Cir. 2006). The military judge made no findings as to this issue, and we lack the authority to do so ourselves. As a result we assume error but find no harm to the accused because he now has the banana in his possession for use at trial.

[8] Ordinarily, on direct review, we analyze nondisclosure claims in a different manner. "[F]irst, we determine whether the information or evidence at issue was subject to disclosure or discovery; second, if there was nondisclosure of such information, we test the effect of that nondisclosure on the appellant's trial." *Roberts*, 59 M.J. at 325. The problem here is that while the *Roberts* analysis works well for direct review, we are in an interlocutory appeal, where there is no way to test the effects on non-disclosure on a trial that has not yet occurred.

government's possession relating to the "box." Second, we must determine whether the trial counsel had any further duty to investigate a "box" held by a cooperating witness in order to comply with R.C.M. 701(a)(6).

As to the first question, based on the facts found by the military judge, the trial counsel disclosed the evidence in the government's possession relating to the "box" of evidence. Although the government had some difficulty reproducing the thumb drive using its G-6 staff section, that staff section eventually printed the contents of the thumb drive. Those documents were given to the defense. The military judge did question whether the documents given to the defense comprised everything on the thumb drive. However, he did not specifically find a suppression of evidence. Furthermore, while the military judge stated that the government knew the "box" "contain[ed] material evidence," the trial counsel did disclose to the defense all evidence the government knew to be included in the "box."[9]

Having determined that the trial counsel disclosed all the evidence in the government's possession and all the evidence known to the government regarding the "box," we must analyze the second question: To what extent did the trial counsel have a duty to seek out exculpatory information in a "box" possessed by a cooperating witness? We conclude that the military judge relied on an erroneous view of the law. The trial counsel disclosed what he knew, as required under R.C.M. 701(a)(6). *Brady* and R.C.M. 701(a)(6) require due diligence, but we find no support for the proposition that the trial counsel must seek exculpatory evidence outside of the government's control or possession.

*United States v. Graham* is an instructive federal case. There, an unindicted co-conspirator testified pursuant to a plea deal with the government. 484 F.3d at 415. Three weeks into trial, that witness produced fifteen boxes, some marked "Graham" of previously undisclosed evidence. *Id.* at 416. The cooperating witness thought he had informed the government of those boxes between a month and a month and a half earlier. *Id.* The prosecutor's notes from several months earlier stated, "[h]aven't turned over old files, 1980s, to Graham's attorney. We want to review them first." *Id.* at 418. The record did not indicate that the government had possession of the boxes. *Id.*

The Sixth Circuit found no *Brady* violation because "cooperating witnesses . . . stand in a very different position in relation to the prosecution than do

---

[9] The military judge separately found that CPT KJ "was under the impression" that he had everything and that "it was not clear until the third continuance in March 2014 . . . that the thumb drive did not contain all the evidence in the possession of Mrs. [MS]."

police officers and other governmental agents.  The Supreme Court in this regard relied directly on the fact that 'the prosecutor has the means to discharge the government's *Brady* responsibility if he will.' [*Kyles*, 514 U.S.] at 438.  That is not necessarily the case with regard to cooperating witnesses, as the circumstances of this case demonstrate."[10]

---

[10] As one district court noted, "insofar as Defendants' submissions can be understood to suggest that a cooperating witness qualifies as a member of the 'prosecution team' thus charging the [g]overnment with the knowledge the witness possesses, [d]efendants do not provide any support for this claim.  Courts that have considered this issue, however, have concluded that a cooperating witness is not, in fact, a member of the prosecution team.  *See, e.g., United States v. Garcia*, 509 F. App'x 40, 42-43 (2d Cir. 2013) (noting that the Second Circuit 'has never held that the 'prosecution team' includes cooperating witnesses'); *Graham*, 484 F.3d at 417 ('Graham argues that the Government exercised effective control over the evidence because Allen was a cooperating witness.  Neither the case law nor the facts of this case support this argument.'); *United States v. Meregildo*, 920 F. Supp. 2d 434, 444-45 (S.D.N.Y. 2013) (concluding that cooperating witness was not a member of the prosecution team); [*United States v. Salahuddin*, No. 10-104, 2012 U.S. Dist. LEXIS 100296, 2012 WL 2952436, at *24 (D.N.J. July 19, 2012)] (rejecting the defendant's claim that the Government was charged with the knowledge of its cooperating witness and stating that the defendant failed to 'offer any support that the Government can be charged with all knowledge possessed by a cooperating witness'); *United States v. Abdulwahab*, No. 10-248, 2011 U.S. Dist. LEXIS 108529, 2011 WL 4434236, at *7 (E.D. Va. Sept. 22, 2011) ('The United States has no duty under *Brady* to investigate evidence that is under the control of a cooperating witness.'); *United States v. Smith*, No. 08-31, 2011 U.S. Dist. LEXIS 63056, 2011 WL 2416804, at *4 (E.D. Ky. June 13, 2011) ('the information in question was in the 'possession,' for lack of a better word, of its cooperating witness - not one of the prosecution's own agents.  For this reason, the Court is not persuaded that this is an instance where the United States willfully ignored information which it would otherwise have been required to disclose under *Brady* . . . .'); *United States v. McCall*, No. 00-0505, 2009 U.S. Dist. LEXIS 113205, 2009 WL 4016616, at *1 (N.D. Cal. Nov. 18, 2009) (declining to extend the prosecutor's duty to learn of any favorable evidence known to police investigators and government agents to include cooperating witnesses); *cf. United States v. Cocchiola*, 358 F. App'x 376, 381 (3d Cir. 2009) ('the requirement that the Government disclose the material evidence in its possession is fundamentally different from placing an affirmative obligation on prosecutors to ferret out any potentially exculpatory evidence.'); *United States v. Harry*, 927 F. Supp. 2d 1185, 1210 (D.N.M. 2013) ('A prosecutor does not have a duty to obtain evidence from third parties.'); *United States v. Lujan*, 530 F. Supp. 2d 1224, 1231 (D.N.M. 2008) ('neither does the government have an affirmative duty

(continued . . .)

Furthermore, the record does not reflect, and the military judge did not find, that Mrs. MS or MS were effectively government agents. In our view, nothing in this case gives us reason to merge the prosecuting sovereign United States and a cooperating witness and treat the two as one. Given the facts, MS and Mrs. MS cooperated with the trial counsel, but did not become agents of the trial counsel.

Thus, the "box," and the evidence within it such as the note documenting the recantation and the emails, were outside the possession and knowledge of the government. The trial counsel did not have a duty to search a "box" belonging to third party cooperating witnesses for exculpatory information. The military judge abused his discretion to the extent that he believed that the trial counsel had such a duty.

### 3. Mrs. MS's Mental Health Records

We find no abuse of discretion from the military judge regarding Mrs. MS's mental health records. Although we might read the record differently, *compare* Article 62 *with* Article 66, we agree with the military judge that the trial counsel should have inquired further into Mrs. MS's mental health records, including the fact that she was receiving therapy after referral of charges, when the military judge ordered the records produced for an in camera review.

### 4. The Denial of Production of Ms. LE

Although the military judge did not expressly state that the government violated a duty by declining to produce Ms. LE as a witness for the defense, it appears that he considered this failure in dismissing the charges.[11] The military judge did not find that the government refused to produce Ms. LE out of bad faith or some other improper purpose. It is clear from the motions that Ms. LE's parents refused to have Ms. LE interviewed and that accordingly no investigator or counsel had interviewed her before the first continuance. The military judge ordered her to be forensically interviewed, and that recording of the interview was served on the defense, albeit slowly, before the second trial date. It is clear from the record that

---

(. . . continued)

under *Brady* to seek out information that is not in its or its agents' possession.').'" *United States v. Munchak*, NO. 3:CR-10-75, 2014 U.S. Dist. LEXIS 98032, *47-*50 (M.D. Penn. July 17, 2014).

[11] The production of witnesses, strictly speaking, is not a question of discovery, but of production. As such, production of witnesses is governed by R.C.M. 703 instead of R.C.M. 701.

the defense only requested Ms. LE as a witness after receiving the forensic interview. It is equally clear from the record that the government was going to produce Ms. LE for trial in response to that request.[12] We fail to see how a military judge could reasonably have found a discovery or production violation here.

### 5. Failure to Preserve Evidence

The military judge also noted the trial counsel's failure to preserve evidence. We first note that most of this evidence involved items either outside the possession and control of the government (such as the "box") or evidence that the accused eventually received (such as the plastic banana). Furthermore, the Supreme Court has required a showing of bad faith when examining instances of failure to preserve evidence. *See Arizona v. Youngblood*, 488 U.S. 51, 58 (1988) ("We therefore hold that unless a criminal defendant can show bad faith on the part of police, failure to preserve potentially useful evidence does not constitute a denial of due process of law."). The military judge made no such finding of bad faith here. With no finding of bad faith, and all potentially exculpatory evidence now in the possession of the accused, we find neither a due process violation nor a violation of military discovery or production rules given the trial counsel's failure to preserve evidence.

### 6. Totality of the Circumstances

We have considered the discovery and production issues "collectively, not item by item." *Kyles*, 514 U.S. at 436. Although we have cited federal cases applying *Brady*, we are cognizant that our statutory and executive guidance is broader than *Brady*. *United States v. Trigueros*, 69 M.J. 604, 609 (Army Ct. Crim. App. 2010). However, in our view, a trial counsel's duty in the military justice system to seek exculpatory information from a non-governmental third party, such as a cooperating witness, is the same as a prosecutor's duty in the federal system.

Nothing in this opinion limits trial counsel from seeking exculpatory evidence from all sources throughout preparation for trial. We encourage such best practices. Nonetheless, we conclude that measuring due diligence in the context of non-governmental third parties is difficult and fraught with concerns. A trial counsel, as agent of the government, has a clear duty to find exculpatory evidence in government files. *See Williams*, 50 M.J. at 439-41. That duty, however, does not

---

[12] The record supports the military judge's finding that the government denied production of Ms. LE in the context of the first continuance request. However, the defense never formally requested production of Ms. LE as a witness until after receiving the recording of the interview.

extend to evidence in the possession of interested third parties and that the trial counsel does not know exists.

### 7. The Remedy of Dismissal

Ultimately, we conclude that the military judge abused his discretion by dismissing the charges and specifications with prejudice. He clearly misjudged the scope and magnitude of the discovery issues in this case. The military judge was in an unenviable position. Multiple times before three distinct trial dates, potentially exculpatory evidence arose which could aid the accused in his defense. However, this potentially exculpatory evidence, such as items from the "box," mostly arose from non-governmental third parties.

In short, it appears that the discovery issues involving the "box," the plastic banana, and Ms. LE have been resolved. The accused is in possession of significantly more potentially exculpatory evidence than when the case was originally docketed. We must balance this gain of potentially exculpatory evidence against the prejudices articulated by the military judge. It is true that a key defense witness, Dr K., has died. It is clear from the record that Dr. K could potentially impeach both MS and Mrs. MS. We do not discount the potential probative power of impeachment evidence. The military judge can force the government to stipulate, either by fact or expected testimony, to Dr. K's impeachment evidence. The military judge also noted that the accused has been "suffering under significant restrictions that serve no legitimate [g]overnment objective in [this] case." The military judge has significant authority to remedy any pretrial punishment, should the matter be litigated. *See* UCMJ art. 13 (prohibiting pretrial punishment). We are also cognizant of the personal and professional setbacks against the accused, which the military judge articulated as an example of the prejudice in this case. However, those setbacks must be balanced against the accused's acquisition of potential exculpatory evidence.

We are left with a definite and firm conviction that dismissal with prejudice is not amongst the reasonable range of remedies for a military judge in this case. This case has not been a model of pretrial discovery and production. The government should have better responded to discovery requests and orders from the military judge, and the government failed to produce some defense witnesses for trial.[13] Although not required to do so, the trial counsel could have asked to personally inspect the "box" in February 2013, so that he could better investigate his case. By doing so, he would have discovered the evidence that only became known to the parties later. He would have then had a duty to disclose that evidence once he

---

[13] The military judge made no ruling on prosecutorial misconduct, and neither do we.

became aware of it. However, not all shortcomings are the government's responsibility. The military judge clearly erred when he ruled that the "box" of evidence and the exculpatory emails and note documenting the recantation within it were discoverable under R.C.M. 701(a)(6).

Thus, dismissal, which is a "disfavored sanction," *see United States v. Rogers*, 751 F.2d 1074, 1076-77 (9th Cir. 1985), is not a reasonable remedy in this case. As one federal circuit court remarked, "we conclude that dismissal for a *Brady* violation may be appropriate in cases of deliberate misconduct because those cases call for penalties which are not only corrective but are also highly deterrent. Deliberate misconduct is targeted for extra deterrence because we expect willful misbehavior to be the most effectively deterred by enhanced penalties." *Virgin Islands v. Fahie*, 419 F.3d 249, 254-55 (3rd Cir. 2005). Here, the military judge did not make a specific finding as to whether trial counsel engaged in willful misconduct. *See United States v. Quinn*, 537 F. Supp. 2d 99, 110 (D.D.C. 2005) ("the government cannot shield itself from its *Brady* obligations by willful ignorance or failure to investigate."). Without a finding of willful ignorance, willful suppression, or other misconduct from the military judge, we cannot conclude that dismissal with prejudice is a reasonable remedy.

In conclusion, we find that the military judge abused his discretion in dismissing the charges and specifications with prejudice where he relied on an erroneous view of aspects of applicable discovery law and the defense eventually came into possession of all of the known information they were seeking. We vacate the military judge's ruling dismissing the charges and specifications with prejudice and remand this case for proceedings not inconsistent with this opinion.

## CONCLUSION

The government's appeal under Article 62 is GRANTED. The military judge's 20 May 2014 ruling is VACATED. The record of trial is returned to the military judge for proceedings not inconsistent with this opinion.

Judge CAMPANELLA and Judge CELTNIEKS concur.

FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court

22